CLINTON H. MITCHELL AND NAOMI H. MITCHELL, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1871–63. Filed August 26, 1964.

---

[3] *Henderson* v. *Flemming*, 283 F. 2d 882 (C.A. 5, 1960), and *Harper* v. *Flemming*, 288 F. 2d 61 (C.A. 4, 1961).

954

Clinton H. Mitchell, pro se.
*Herbert T. Ikazaki*, for respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax for the taxable years 1959 and 1960 in the respective amounts of $14,708.03 and $1,357.32.

The parties having made certain concessions, the issues remaining are:

(1) Whether the petitioners may report the gain on an exchange of property, recognized under section 1031(b),[1] on the installment method pursuant to the provisions of section 453, or, whether such gain is taxable in the year of the exchange;

(2) Whether, as part of such exchange the petitioners received, besides a motel and its furnishings, an interest in a 99-year lease to the land upon which the motel is located, requiring the allocation thereto of some portion of the consideration given by the petitioners in the exchange, or whether such consideration is all attributable to the motel and furnishings, for purposes of determining the basis for depreciation;

(3) Whether in computing depreciation on the motel and furnishings for the taxable years 1959 and 1960 the petitioners are required to use the straight-line method as shown in the original return for the year 1959, or whether they may use the declining-balance method claimed in an amended return for the year 1959 filed after the statutory due date for the filing of the return, they having stated in the original return that they reserved the right to alter the method of depreciation;

(4) Whether the petitioners are entitled for the year 1959 to an additional first year allowance for depreciation on furniture and fixtures under section 179;

(5) Whether petitioners, who kept their books and records on the cash receipts and disbursements method of accounting for the taxable years in question, can claim deductions, under section 163, for interest accrued but unpaid;

(6) Whether petitioners are entitled to deductions claimed for each of the taxable years in question for traveling expenses; and

(7) Whether petitioners are entitled to deductions, claimed for the year 1959 as charitable contributions, representing depreciation on their private automobile and the cost of meals incurred while engaged in rendering services to charitable and religious organizations.

### FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by reference.

The petitioners are husband and wife. The husband will hereinafter be referred to as the petitioner. During the taxable year 1959 petitioners maintained their personal residence in a home in Redlands, Calif. For such taxable year they filed with the district director of internal revenue, Los Angeles, Calif., four joint income tax returns. The four returns were filed on or about January 17, 1960, January 29, 1960, December 27, 1960, and August 14, 1961. Each of

---

[1] All references herein are to the Internal Revenue Code of 1954 unless otherwise specified.

the returns, filed after January 17, 1960, purported to amend the immediately preceding return. The last return was filed after the petitioners had been called in for conferences with representatives of the Internal Revenue Service.

For the taxable year 1960, petitioners filed two joint income tax returns with the district director of internal revenue in Los Angeles. The first return was filed on April 14, 1961. The second return, purporting to amend the first return, was filed on August 17, 1961. The petitioners kept their books and records and filed all their returns on the cash receipts and disbursements method of accounting.

On January 16, 1959, the petitioners entered into an "Exchange Agreement" with Ralph R. and Mona E. Petreny, husband and wife, whereby the Petrenys agreed to exchange a motel, known as the Musketeer Motel, located at Anaheim, Calif., for two pieces of improved real property belonging to the petitioners, consisting of premises 8800–8806 Sunset Boulevard and 1021–1025 Palm Avenue, Los Angeles, Calif. In the exchange agreement it was stated that for purposes of the exchange the petitioners' property was valued at $148,000, subject to an encumbrance of approximately $18,624 (less January payment), and that for purposes of the exchange the Petrenys' property was valued at $247,000, subject to a deed of trust in favor of a bank in the approximate amount of $80,872.60 (after February payment). It was further provided that included in the purchase price, and to remain on the property, were all furnishings, bedding, linens, signs, and all equipment for the operation of the motel. In the escrow instructions the petitioners and the Petrenys valued all this equipment at $47,000. It was agreed that the Petrenys would execute in favor of the petitioners a trust deed in the amount of approximately $69,576, and that the petitioners would execute in favor of the Petrenys a note and chattel mortgage in the approximate amount of $105,000, with interest at 6 percent per annum. It was provided that the combined payments which the petitioners should make on the deed of trust in favor of the bank which they had assumed and the note and chattel mortgage which they would execute in favor of the Petrenys should not be more than $1,600 monthly.[2] It was further provided that the Petrenys would sublease to the petitioners the land upon which the motel was located.[3]

---

[2] Apparently the payments due on the deed of trust in favor of the bank were $1,600 per month. In the exchange agreement it was stated that it was understood that the bank would reduce the payments to $1,000 per month, that thereafter the petitioners would pay monthly $1,000 to the bank and $600 to the Petrenys, and that when the bank should be paid in full the petitioners would pay $1,600 monthly to the Petrenys with interest at 6 percent. The interest payable on the bank loan was 6 percent per annum.

[3] The Petrenys were lessees under a lease dated Apr. 4, 1958, for a term of 99 years under which it was contemplated that the Petrenys would construct and operate a motel. The Petrenys were required to pay a basic rental of $800 per month, plus a percentage of the gross receipts received from the premises above a specified amount of gross receipts.

Thereafter, pursuant to the provisions of the exchange agreement, the petitioners transferred their property located in Los Angeles to the Petrenys, subject to an encumbrance of $18,502.39, and executed a note and chattel mortgage in favor of the Petrenys in the amount of $106,127.40, with interest at 6 percent per annum. The Petrenys transferred the motel to the petitioners, subject to a deed of trust in favor of the bank in the amount of $80,873.61, and executed in favor of the petitioners a note in the amount of $69,497.61, secured by a deed of trust, which was payable in monthly installments of $695, which included interest at 6 percent per annum.

Also, in accordance with the above agreement, the petitioners and the Petrenys entered into a sublease on January 27, 1959, of the portion of the premises covered by the Petrenys' 99-year lease upon which the motel was located. The sublease was for the remaining term of the original lease, approximately 98 years. In the sublease the petitioners agreed to pay to the Petrenys the sum of $500 per month basic rental, plus 7 percent of the gross receipts derived from the premises in excess of $80,000 per annum for a period of 30 months, and plus 7 percent of the gross receipts derived from the premises in excess of $70,000 per annum thereafter. It was further provided that if the petitioners should, among other things, sublease the premises or transfer their sublease, they should remain liable for a basic rental of $500 per month, plus 7 percent of the gross receipts derived from the leased premises in excess of $60,000 per year. It was provided that, except insofar as its terms were changed and modified by the sublease, the petitioners accepted the sublease subject to all the terms and conditions of the original lease.

The real property conveyed by the petitioners in the exchange had an adjusted basis of $32,526.13. It had a fair market value of $148,000, subject to an outstanding mortgage of $18,502.39.

The property received by the petitioners in the exchange, consisting of the motel building and furniture and fixtures, had a fair market value of $247,000, subject to an outstanding mortgage of $80,873.61.

The construction of the motel had been completed on or about July 1, 1958. The motel is located adjacent to Disneyland, an entertainment park which attracted many tourists and visitors. At the time of the exchange the area was experiencing a boom and many other motels have been built in the vicinity.

In their original joint income tax return for the taxable year 1959, the petitioners reported that gain realized upon the exchange was recognized in the amount of the note received in the amount of $69,497.61. However, they reported that they had received only 10 payments under such note, each in the amount of $695, or a total of $6,950. Therein they reported that of this sum $3,395.61 represented interest, taxable as ordinary income, and that $3,554.39 represented

long-term capital gain received in the taxable year, of which they included in taxable income $1,771.19 (purporting to be one-half of $3,554.39).

In their joint return for 1959 filed on December 27, 1960, the petitioners reported capital gain of only 32.5 percent of the amount of $3,554.39 and included as taxable income one-half of that amount, or $577.50. In arriving at the percentage applied, they reduced the asserted cost of the property transferred, $63,660.41, by the balance owing on the deed of trust at the date of the exchange, $18,502.39, and added costs incurred in the exchange of $1,809.98, arriving at an amount of $46,968, which was stated to be the total cash which they had invested in the property. They then treated $46,968 of the amount of $69,497.61 note, as being a return of investment, and the remainder, 32.5 percent, as gain.

In their joint return for 1959 filed on August 14, 1961, the petitioners reported no taxable gain on the transaction, on the ground that since they had a cash investment of $46,968 in the property, no gain would be realized until the recovery thereof, and that the ultimate gain to be reported would be the difference between $46,968 and the amount of the note received, $69,497.61, or $22,529.61.

In their original joint income tax return filed for the taxable year 1960, the petitioners reported long-term capital gain of $719, representing 32.5 percent of the payments received from the Petrenys in that year, and included in taxable income one-half that amount, $359.50. In their joint return filed for 1960 on August 17, 1961, the petitioners reported no taxable income from the exchange, presumably on the ground as stated in the return for 1959 filed on August 14, 1961.

In the notice of deficiency the respondent determined that the petitioners realized gain of $113,278.89 on the exchange, of which $69,497.61 is to be recognized, that the full amount of $69,497.61 is to be recognized for the year 1959, and that no gain on the transaction was realized in the taxable year 1960. He therefore increased taxable capital gain reported in the original return for 1959 and eliminated the taxable capital gain reported from this transaction in the original return for 1960. His explanation was as follows:

On your original income tax return for 1959 and 1960 you reported long-term capital gains of $3,554.39 and $719.00, respectively. These gains were included in taxable income to the extent of 50 percent, or $1,771.19 (should have been $1,777.19) and $359.50, respectively. It is determined that you realized a long-term capital gain of $67,804.18 in 1959, which is taxable to the extent of 50 percent, or $33,902.09, and that no gain was realized in 1960. It is further determined that the gain of $69,497.61 recognized on the exchange of rental properties in 1959, cannot be reported on the installment method under Section 453 of the Internal Revenue Code of 1954. Accordingly, taxable income for 1959 is increased by $32,130.90 ($33,902.09 minus $1,771.19) and taxable income for 1960 is decreased by $359.50. The net capital gain is computed as follows:

Long-term capital gain (loss):

| | | |
|---|---|---|
| Fair market value of property received | | $247,000.00 |
| Mortgage assumed by other party | | 18,502.39 |
| Second trust deed (other property) | | 69,497.61 |
| Total consideration received | | 335,000.00 |
| Less: | | |
| Adjusted basis of property transferred | $32,526.13 | |
| Liabilities assumed | 187,000.00 | |
| Selling expenses | 2,194.98 | 221,721.11 |
| Realized gain | | 113,278.89 |
| Recognized gain (limited to other property received) | | 69,497.61 |
| Less losses: | | |
| Loss on foreclosure (1) | (1,676.58) | |
| Loss on sale of typewriter (2) | (16.85) | (1,693.43) |
| Net gain from sec. 1231 assets (treated as a long-term capital gain) | | 67,804.18 |
| Taxable at 50 percent | | 33,902.09 |

In their original return filed for 1959, the petitioners claimed depreciation, for 10 months, on the motel in the amount of $9,444.45 and depreciation on the furniture and fixtures in the amount of $3,500, using as a basis for the motel $200,000 (less a salvage value of $30,000) and as a basis for the furniture and fixtures $47,000 (less a salvage value of $5,000). The depreciation was computed on the straight-line method, using a 15-year useful life for the motel and a 10-year useful life for the furniture and fixtures. At the bottom of page 1 of such original return the petitioners wrote "Filed with the reservation of altering depreciation page 7 to more favorable terms if found possible."

In their joint income tax returns for 1959, filed on January 29, 1960, and December 27, 1960, the petitioners claimed depreciation on the motel and the furniture and fixtures in the same amounts as on the original return, computed in the same manner. In their joint return filed on August 14, 1961, for the taxable year 1959, the petitioners claimed depreciation on the motel in the amount of $6,666.07 and depreciation on the furniture and fixtures in the amount of $4,475.81, using as a basis for the motel $106,657.88 and using as a basis for the furniture and fixtures $25,064.54. The depreciation was computed on the declining-balance method (using 1½ times the amount of depreciation which would be computed on the straight-line method), and using a 20-year useful life for the motel and a 7-year useful life for the furniture and fixtures.

In their original joint income tax return for the taxable year 1960, the petitioners computed depreciation on the motel and on the furniture and fixtures in the same manner as they did in their original

return for 1959, claiming depreciation on the motel in the amount of $11,333 and $4,200 for the furniture and fixtures. In their joint income tax return for 1960, filed on August 17, 1961, the petitioners used the basis and method used in the return for 1959 filed on August 14, 1961, and claimed depreciation on the motel in the amount of $7,499.36 and depreciation on the furniture and fixtures in the amount of $4,411.88.

In the notice of deficiency the respondent determined that the depreciation allowable on the motel for the taxable year 1959 was $4,662.26, and that the amount allowable on the furniture and fixtures was $4,603.49, and disallowed the difference between those amounts and the amounts claimed in the petitioners' original return for 1959. He used the straight-line method and determined that the useful life of the motel was 25 years and that the useful life of the furniture and fixtures was 7 years. The respondent determined that the adjusted basis of the motel was $139,867.83 and that the adjusted basis of the furniture and fixtures was $38,669.34. He determined that in the exchange the petitioners acquired not only the motel and furniture and fixtures but also an interest in the 99-year lease and computed the adjusted basis of the property received as follows:

| | | |
|---|---|---|
| Adjusted basis of property conveyed | | $32,526.13 |
| Liabilities encumbering property received [includes note of $106,127.40 given by petitioners] | | 187,001.01 |
| Expense of sale | | 2,194.98 |
| Total | | 221,722.12 |
| Less: | | |
| Liabilities encumbering property conveyed | $18,502.39 | |
| Other property received (note secured by property conveyed) | 69,497.61 | 88,000.00 |
| | | 133,722.12 |
| Add: Recognized gain (other property received) | | 69,497.61 |
| Basis of property received in the exchange (entire motel unit) | | 203,219.73 |

The respondent then determined that of the total fair market value of $247,000 of the property received by the petitioners in the exchange, $170,000 was attributable to the motel building, $47,000 was attributable to the furniture and fixtures, and that $30,000 was attributable to "98-year leasehold," and prorated the overall adjusted basis of the property received in the exchange as follows:

| Property | Fractional allocation | Adjusted bases |
|---|---|---|
| Motel building | 170/247 of $203,219.73 | $139,867.83 |
| Furniture and fixtures | 47/247 of $203,219.73 | 38,669.34 |
| 98-year leasehold | 30/247 of $203,219.73 | 24,682.56 |
| Total | | 203,219.73 |

In the notice of deficiency the respondent determined that the petitioners were entitled to depreciation for the taxable year 1960, on the straight-line method, on the motel in the amount of $5,594.71 and on the furniture and fixtures in the amount of $5,524.19. For the taxable years 1959 and 1960 he allowed depreciation on the 98-year lease in the respective amounts of $209.88 and $251.86.

During the taxable years 1959 and 1960 interest accrued on the $106,127.40 note which the petitioners had given to the Petrenys in the exchange. However, under an agreement between the petitioners and the Petrenys only $100 per month of such interest was paid, the remainder of the interest which accrued being added to the principal of the indebtedness. The amounts of interest so accrued but unpaid in the taxable years 1959 and 1960 were, respectively, $4,393.58 and $5,577.27. These amounts were not claimed as deductions by the petitioners in their original returns filed for those taxable years.

During 1959 the petitioners had investment property in Los Angeles, West Hollywood, Sherman Oaks, Redlands, and San Bernardino. They held deeds of trust on property in San Bernardino which required attention. The petitioner also traveled to other places looking for business investments which did not materialize.

Throughout the year 1959 and during January 1960, the petitioners lived in a five-room house in Redlands, Calif. One room in such house was used by the petitioner as an office. In their original return for 1959 the petitioners claimed a deduction of $240 on account of depreciation on, and cost of utilities for, such office. Of this amount the respondent in the notice of deficiency allowed $135 and disallowed $105.[4]

From the time the petitioners acquired the Musketeer Motel at Anaheim, Calif., in February 1959 until early September 1960, they employed a resident manager for the motel. During the period February 1959 to January 1960, the petitioner made trips in his own automobile, on the average of about once a week, from his residence in Redlands to the motel to supervise the management of the motel. Sometimes the round trip was accomplished in a day and sometimes the petitioner stayed overnight at the motel. When he stayed overnight he stayed in the motel and incurred no cost of lodging. However, he did incur expenses for some meals. The expenses so incurred in 1959 amounted to $1,050 (of which $756 was for the cost of travel by automobile for 6,300 miles at 12 cents per mile, and $294 was for

---

[4] At the hearing the petitioners conceded the correctness of the respondent's determination in this respect.

meals) and in 1960 amounted to $125 (consisting of automobile transportation and some meals, not itemized).[5]

At some time early in 1960 the petitioners sold their house in Redlands, Calif., attached a large house trailer to their car, and drove to Florida. After spending about 3 months in Florida they drove up the eastern coast of the United States, stopping at various places for periods of from 2 to 10 days to sightsee and visit friends. They drove as far as Bar Harbor, Maine, and spent about 2 months there. During this period some of petitioners' mail was sent directly to them and some was sent to Redlands, Calif., where it was forwarded. Throughout this period petitioners' profitmaking interests were in California, the principal one being the motel at Anaheim. In late August 1960, the petitioners received word that the motel was not being operated in a proper manner. They thereupon drove back to Anaheim, arriving there about Labor Day 1960. They discharged the manager of the motel and lived in an apartment in the motel for the remainder of the year. They continued to operate the motel until March 1, 1961, when they sold it. Thereafter they resumed their interrupted travel and then returned to reside in Redlands in the fall of 1961.

In their original income tax returns filed for the taxable years 1959 and 1960 the petitioners claimed deductions in the respective amounts of $1,050 and $125 on account of the expenses incurred on trips between the residence at Redlands and the motel at Anaheim. These amounts were disallowed by the respondent in the notice of deficiency with the statement that they represented nondeductible personal, living, or family expenses.

In their original return for the taxable year 1960 the petitioners deducted amounts totaling $1,004.70 on account of the trip from Bar Harbor, Maine, to Anaheim, Calif. In connection therewith the petitioner described these expenses as attributable to "abandonment of trip and emergency return from Bar Harbor." This amount consisted of $680 on account of automobile travel (3,400 miles at 20 cents per mile) and $324.70 described as "To casualties en route, $108.00" and "Uninsured casualties on trip, overloaded tires blowout, dealers refused adjustments, broken battery, $216.70." This deduction was disallowed by the respondent in the notice of deficiency with the explanation that the amount represented nondeductible personal, living, or family expenses.

The petitioner was, in 1959, chairman of the community chest drive in Redlands, Calif. He was also active in work for the Boy Scouts

---

[5] In their original return for 1960 the petitioners claimed a deduction of $195, which included this amount of $125, and an amount of $70 on account of trips from Anaheim to Redlands, San Bernardino, and other places to attend to investments, including the foreclosure of a deed of trust on property in San Bernardino, and attending to the rental of a trailer. At the hearing counsel for the respondent conceded that the $70 which had been disallowed is deductible.

and was a member of a church committee. In connection with the affairs of these charitable and religious organizations the petitioner used his car. Sometimes he met various committees for breakfast, lunch, or dinner, paying for his own meals, without reimbursement.

In their original return for the taxable year 1959 the petitioners claimed as a charitable deduction an aggregate amount of $172.09 for use of the automobile, computed at the rate of 12 cents per mile. They also deducted $41.37 as an amount spent by petitioner for meals consumed by him while rendering services to the charitable organizations. Of the total amount of $213.46 claimed, the respondent disallowed $111.16 "because it has not been established that the amount in excess of $102.30 represents a charitable contribution, or was expended for the purpose designated." The amount disallowed consists of the entire amount claimed on account of meals and $69.79 of the amount claimed on account of use of the automobile, which the respondent determined to be depreciation on the automobile. The amount of $102.30 was computed by the respondent at the rate of 6 cents per mile and was determined by him to be the out-of-pocket expenses incurred in operating the automobile.

In their original income tax return for the taxable year 1959 the petitioners reported income of $21,814.91 from the operation of the motel, $4,415.96 of interest, $2,497 of rent, and $1,771.19 of capital gain.

In their original return for the taxable year 1960 the petitioners reported income of $4,575.26 from the operation of the motel, $4,182.03 of interest, $359.50 of capital gain, and $604 of rent.

OPINION

The first issue presented relates to the manner of reporting the recognized gain which the petitioners realized upon the exchange in 1959. The parties are in agreement as to the basis of the property which the petitioners exchanged and the fair market value of the property received. They are also in agreement that the transaction falls within the provisions of section 1031(b) of the Internal Revenue Code of 1954,[6] and that therefore the amount of the gain to be recognized is

---

[6] Sec. 1031 provides in part as follows:

(a) NONRECOGNITION OF GAIN OR LOSS FROM EXCHANGES SOLELY IN KIND.—No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.

(b) GAIN FROM EXCHANGES NOT SOLELY IN KIND.—If an exchange would be within the provisions of subsection (a), of section 1035(a), of section 1036(a), or of section 1037(a), if it were not for the fact that the property received in exchange consists not only of property permitted by such provisions to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

the amount of the note received by the petitioners from the Petrenys in the amount of $69,497.61. The petitioners contend, however, that they are entitled to return the recognized gain on the installment method under section 453 of the Code.[7] The respondent contends that the transaction does not meet the qualifications set forth in section 453, in that the payments received in the year of the transaction exceeded 30 percent of the selling price, and that therefore the petitioners may not employ the installment method.

Section 453 permits the use of the installment method, in the case of a sale or other disposition of real property or the casual sale or other casual disposition of personal property, only if in the taxable year of the sale or other disposition there are no payments, or the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price. There are set forth in the margin pertinent portions of section 1.453-4 of the Income Tax Regulations.[8] The regulations have continued through many years without substantial change and have been upheld in many cases. See

---

[7] SEC. 453. INSTALLMENT METHOD.

(a) DEALERS IN PERSONAL PROPERTY.—Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.

(b). SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—

(1) GENERAL RULE.—Income from—

(A) a sale or other disposition of real property, or

(B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000,

may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a).

(2) LIMITATION.—Paragraph (1) shall apply—

(A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition—

(i) there are no payments, or

(ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.

[8] Sec. 1.453-4 of the regulations provides in part as follows:

Such sales [sales of real property involving deferred payments], under either paragraph (a) (1) or (2) of this section, fall into two classes when considered with respect to the terms of sale, as follows:

(1) Sales of real property which may be accounted for on the installment method, that is, sales of real property in which (i) there are no payments during the taxable year of the sale or (ii) the payments in such taxable year (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price, or

(2) Deferred-payment sales of real property in which the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable year in which the sale is made exceed 30 percent of the selling price.

(c) Determination of "selling price". In the sale of mortgaged property the amount of the mortgage, whether the property is merely taken subject to the mortgage or whether the mortgage is assumed by the purchaser, shall, for the purpose of determining whether a sale is on the installment plan, be included as a part of the "selling price"; and for the purpose of determining the payments and the total contract price as those terms are used in section 453, and §§ 1.453-1 through 1.453-7, the amount of such mortgage shall be included only to the extent that it exceeds the basis of the property. * * *

*Burnet* v. *S. & L. Building Corporation*, 288 U.S. 406, in which the Supreme Court stated in part:

Installment sales of real estate encumbered by liens give rise to many complications which Congress could not readily foresee. Accordingly, it entrusted to the Commissioner wide discretion in respect of details. And considering the practical requirements of the taxing system, we think the regulations now challenged constitute a fair attempt to effectuate the legislative intent. They are within the broad discretion granted to the Commissioner and violate no definite provision of the statute.

The substance of the contention made by the petitioners on brief is that the "selling price" of their property was equivalent to the net value thereof, $129,498 ($148,000 less mortgage of $18,502) ; that in computing the amount of the payments received in the year of the transaction there is not to be included the $69,497.61 note of the Petrenys or any of the property received in the exchange (on the ground that such property is exempt under section 1031) ; that the only payments received in the year of the transaction consisted of the cash payments totaling $6,950 (disregarding the fact that $3,395.61 of the $6,950 represented interest) ; that therefore the payments received in the year of the transaction were far less than 30 percent of the selling price; and that therefore they are entitled to employ the installment method. We cannot agree with the petitioners' view as to either the "selling price" involved in the transaction or the amount of the payments received in the year of the transaction.

Section 453(b)(2)(A)(ii) of the Code, in referring to payments received in the year of sale or other disposition, excludes from consideration only evidences of indebtedness of the purchaser which are received. Clearly the statute contemplates that any other payments, whether in cash or other property, are to be taken into account. See the Income Tax Regulations which so interpret the statute.

In 1959, the year of the transaction, the petitioners received payments totaling $169,680.78, consisting of the motel and furniture and fixtures valued by the parties to the transaction at $247,000, subject to an encumbrance of $80,873.61, and payments (exclusive of interest) of $3,554.39. The "selling price" involved in the transaction was $254,126.39, consisting of the net value of the motel and furnishings and fixtures, $166,126.39, plus the assumption by the purchasers of the encumbrance on petitioners' property of $18,502.39, plus the purchasers' note of $69,497.61. Obviously, the payments received in the year of the transaction exceeded 30 percent of the selling price.

It follows that the petitioners are not entitled to employ the installment method for reporting the gain. This being true, the petitioners are taxable in the year 1959 on the full amount of the gain recognized under section 1031(b) of the Code. The respondent's determination in this respect is approved. It is unnecessary to consider the alterna-

tive contention made by the respondent that the petitioners did not properly elect to use the installment method.

The next issue relates to the depreciation allowable for each of the years in question on the motel and on the furniture and fixtures. The primary controversy relates to the basis of these assets. The petitioners do not disagree with the aggregate adjusted basis of $203,219.73, determined by the respondent under section 1031(d) of the Code,[9] for the property received by them in the exchange. They do disagree with the respondent's allocation of any portion of the amount of $203,219.73 to the sublease.

The respondent determined that the sublease had a value of $30,000 and that some portion of the adjusted basis should be allocated to it. Inherent in this determination is a determination that some portion of the consideration passing from the petitioners in the exchange is attributable to the acquisition of the sublease. However, the parties to the exchange agreement agreed that the value of the motel was $200,000 and that the value of the furniture and fixtures was $47,000, and the exchange was made on those terms. No consideration was attributed to the agreement to execute the sublease. In this connection it is important to note that there was no assignment by the Petrenys of their 99-year lease or any interest therein. Rather, the Petrenys executed a sublease in favor of the petitioners of a part of the land covered by their original lease. Under the terms of the sublease the petitioners and the Petrenys agreed to the amount of rental to be paid. There is no indication that the parties were not acting at arm's length in fixing the rental. The petitioner testified that the rent paid was actually excessive and that no consideration was given in the transaction to any value of the interest which he acquired by sublease. As we read the exchange agreement no consideration passed from the petitioners to the Petrenys for the execution of the sublease. Rather, it appears to us that the execution of the sublease was merely a condition to the carrying out of the exchange agreement. Under the circumstances, we are of the opinion that the respondent erred in attributing any portion of the computed basis to the sublease. Upon the

---

[9] Sec. 1031(d) of the Code provides in part as follows:

(d) BASIS.—If property was acquired on an exchange described in this section, * * * then the basis shall be the same as that of the property exchanged, decreased in the amount of any money received by the taxpayer and increased in the amount of gain or decreased in the amount of loss to the taxpayer that was recognized on such exchange. If the property so acquired consisted in part of the type of property permitted by this section * * * to be received without the recognition of gain or loss, and in part of other property, the basis provided in this subsection shall be allocated between the properties (other than money) received, and for the purpose of the allocation there shall be assigned to such other property an amount equivalent to its fair market value at the date of the exchange. For purposes of this section * * * where as part of the consideration to the taxpayer another party to the exchange assumed a liability of the taxpayer or acquired from the taxpayer property subject to a liability, such assumption or acquisition (in the amount of the liability) shall be considered as money received by the taxpayer on the exchange.

recomputation under Rule 50, the adjusted basis of $203,219.73 will be allocated between the motel building and the furniture and fixtures in proportion to their values of $200,000 and $47,000, respectively. Upon such recomputation the petitioners will not be entitled to depreciation on the 99-year lease as determined by the respondent in the notice of deficiency.

The petitioners contend that they are entitled to compute depreciation on the motel and on the furniture and fixtures on the declining-balance method and that the respondent erred in computing such depreciation on the straight-line method.

Section 167 of the Internal Revenue Code of 1954 provides that there shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear, and tear of property used in the trade or business or of property held for the production of income. It also provides that for years ending after December 31, 1953, the term "reasonable allowance" shall include an allowance, computed in accordance with regulations prescribed by the Secretary or his delegate, under any one of several methods. Included among such methods are the straight-line method and the declining-balance method (using a rate not exceeding twice the rate which would have been used had the allowance been computed under the straight-line method).

Section 1.167(a)–7 of the Income Tax Regulations provides that depreciable property may be accounted for by treating each individual item as an account, or by combining two or more assets in a single account, and that depreciation allowances shall be computed separately for each account. Section 1.167(e)–1 of the regulations provides that any change in the method of computing the depreciation allowance with respect to a particular account is a change in method of accounting, and that such a change will be permitted only with the consent of the Commissioner, except that a change from the declining-balance method to the straight-line method shall be permitted without consent.

In their original return for the taxable year 1959, filed on January 17, 1960, the petitioners used the straight-line method in computing the allowance for depreciation on the motel and on the furniture and fixtures. They now claim that this was not binding upon them in view of the fact that on the first page of such return they wrote "Filed with the reservation of altering depreciation page 7 to more favorable terms if found possible." They therefore, in effect, contend that they had not adopted a method for computing depreciation on the motel and on the furniture and fixtures for the taxable year 1959, the year of acquisition of those assets, until they filed their fourth return for 1959, on August 14, 1961, in which they used the declining-balance method for computing the allowance.

In the second return for 1959, filed on January 29, 1960, which was within the time prescribed by the statute for the filing of the return

for that year, they continued to use the straight-line method and indeed employed such method in the third return, filed for that year on December 27, 1960, without including in either the second or the third return any such reservation as was noted in the original return. Furthermore, on April 14, 1961, they filed their original return for the taxable year 1960 and therein continued to use the straight-line method of computing the allowance for depreciation on these assets, without notation of any reservation. It was not until about 5 months thereafter, after the petitioners had been called in for conferences with representatives of the Internal Revenue Service with respect to the 1959 tax liability, that the fourth return was filed for the taxable year 1959 and the second return was filed for the taxable year 1960, using the declining-balance method of computing the depreciation allowance.

Under the described circumstances, we think it must be considered that the petitioners had adopted the straight-line method for computing the allowance for depreciation on these assets. No claim is made that application had been made, in accordance with the regulations, to the Commissioner for consent to change such method. Accordingly, it is our conclusion that the respondent properly determined that for the years in question the petitioners are required to use the straight-line method for computing the allowance for depreciation. See *M. Pauline Casey*, 38 T.C. 357.

It should be pointed out that the respondent determined a useful life of 25 years for the motel building. The parties are in agreement that such property had a useful life of 25 years. The respondent in his determination used a 7-year useful life for the furniture and fixtures. Apparently the parties are in agreement as to this also. In any event, there is no evidence to show that the respondent's determination in this respect was erroneous.

In their petition the petitioners also make claim for an additional first-year depreciation allowance on the furniture and fixtures for the taxable year 1959, pursuant to section 179 of the Code. That section provides that the term "reasonable allowance" as used in section 167(a) may, at the election of the taxpayer, include an allowance, for the first taxable year for which a deduction is allowable with respect to certain property, of 20 percent of the cost of such property. It further provides that the election shall be made within the time prescribed by law for filing the return for such taxable year. There is no evidence to show that any such election was made by the petitioners. Accordingly, we must conclude that they are not entitled to the benefit of section 179.

The petitioners claim that they are entitled to interest deductions for the taxable years 1959 and 1960, not claimed in their original returns for those years, in the respective amounts of $4,393.58 and $5,577.27.

These amounts represent the portions of the interest accrued in those years on the note given to the Petrenys, but which were not paid. The petitioners operated upon the cash receipts and disbursements method of accounting. It is axiomatic that taxpayers on the cash receipts and disbursements method of accounting may not deduct liabilities until actual payment thereof is made. *Eckert* v. *Burnet*, 283 U.S. 140; *Helvering* v. *Price*, 309 U.S. 409; *Hart* v. *Commissioner*, (C.A. 1) 54 F. 2d 848; and *Eli D. Goodstein*, 30 T.C. 1178, affd. (C.A. 1) 267 F. 2d 127. The petitioners are not entitled to deduct the amounts in question.

The petitioner claims deductions, under section 162(a) of the Internal Revenue Code of 1954,[10] for the taxable years 1959 and 1960 in the respective amounts of $1,050 and $125, representing costs of traveling by his own automobile between his residence at Redlands, Calif., and the motel which he owned and operated at Anaheim, Calif., and costs of meals consumed while on such trips. These trips were made on the average of about once a week and were for the purpose of supervising the management of the motel. The respondent does not question the amounts involved, but he determined, and contends, that they represent nondeductible personal, living, or family expenses.[11]

In *Commissioner* v. *Flowers*, 326 U.S. 465, the Supreme Court held that transportation expenses between the taxpayer's residence in Jackson, Miss., and the place where he performed his work for a railroad in Mobile, Ala., and cost of meals and lodging incurred in Mobile were not deductible under section 23(a)(1)(A) of the Internal Revenue Code of 1939, which is substantially the same as section 162(a)(2) of the 1954 Code. In so doing the Supreme Court approved regulations promulgated under section 23(a)(1)(A) of the 1939 Code, which are substantially the same as section 1.162–2 of the Income Tax Regulations [12] promulgated pursuant to section 162(a)(2) of the 1954 Code.

---

[10] Sec. 162(a)(2) of the Code provides as follows:

(a)| IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

\*          \*          \*          \*          \*          \*          \*

(2) traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; and

[11] Sec. 262 of the Code provides that except as otherwise expressly provided, "no deduction shall be allowed for personal, living, or family expenses."

[12] Sec. 1.162–2 of the Income Tax Regulations provides in part as follows:

(a) Traveling expenses include travel fares, meals and lodging, and expenses incident to travel such as expenses for sample rooms, telephone and telegraph, public stenographers, etc. Only such traveling expenses as are reasonable and necessary in the conduct of the taxpayer's business and directly attributable to it may be deducted. If the trip is undertaken for other than business purposes, the travel fares and expenses incident to travel are personal expenses and the meals and lodging are living expenses. If the trip is solely on business, the reasonable and necessary traveling expenses, including travel fares, meals and lodging, and expenses incident to travel, are business expenses. \* \* \*

\*          \*          \*          \*          \*          \*          \*

(e) Commuters' fares are not considered as business expenses and are not deductible.

It was pointed out that the meaning of the word "home" with reference to a taxpayer residing in one city and working in another has engendered much difficulty and litigation, some courts, including the Tax Court, defining it as the equivalent of the taxpayer's place of business, and others confining the term to the taxpayer's actual residence. The Court deemed it unnecessary to decide such conflict. It pointed out that in order for a traveling expense deduction to be taken three conditions must be met, including the condition that the expense must be incurred in pursuit of business, that is, that there must be a direct connection between the expenditure and the carrying on of the trade or business of the taxpayer or of his employer. The Supreme Court further stated in part:

The facts demonstrate clearly that the expenses were not incurred in the pursuit of the business of the taxpayer's employer, the railroad. Jackson was his regular home. Had his post of duty been in that city the cost of maintaining his home there and of commuting or driving to work concededly would be non-deductible living and personal expenses lacking the necessary direct relation to the prosecution of the business. The character of such expenses is unaltered by the circumstance that the taxpayer's post of duty was in Mobile, thereby increasing the costs of transportation, food and lodging. Whether he maintained one abode or two, whether he traveled three blocks or three hundred miles to work, the nature of these expenditures remained the same.

The added costs in issue, moreover, were as unnecessary and inappropriate to the development of the railroad's business as were his personal and living costs in Jackson. They were incurred solely as the result of the taxpayer's desire to maintain a home in Jackson while working in Mobile, a factor irrelevant to the maintenance and prosecution of the railroad's legal business. * * * The fact that he traveled frequently between the two cities and incurred extra living expenses in Mobile, while doing much of his work in Jackson, was occasioned solely by his personal propensities. * * *

Business trips are to be identified in relation to business headquarters. The exigencies of business rather than the personal conveniences and necessities of the traveler must be the motivating factors. Such was not the case here.

The courts have always recognized a distinction between expenses of traveling incurred in carrying on a trade or business and commuting expenses, that is, those incurred in going from one's residence to one's place of work and return. The latter have always been recognized to be nondeductible personal expenses, regardless of the distance traveled between the residence and the place of business. *Frank H. Sullivan*, 1 B.T.A. 93; *Mort L. Bixler*, 5 B.T.A. 1181; *Charles H. Sachs*, 6 B.T.A. 68; *Abraham W. Ast*, 9 B.T.A. 694; *William L. Heuer, Jr.*, 32 T.C. 947, affirmed per curiam (C.A. 5) 283 F. 2d 865; *Leo M. Verner*, 39 T.C. 749; and *Wright* v. *Hartsell*, (C.A. 9) 305 F. 2d 221.

In the instant case the petitioner's business consisted of the opera-

tion of the motel at Anaheim.[13]   The traveling expenses incurred on trips between his residence in Redlands and Anaheim on an average of about once a week were not expenses incurred in the operation of such motel, but were personal expenses incurred in going from his residence to his place of business.   It was not the exigencies of the business, but the personal convenience of the petitioner, which motivated the expenditures.   The respondent did not err in disallowing the claimed deductions.

The petitioners also claim the right to deduct as traveling expenses under section 162(a)(2) of the Code the amount of $1,004.70 on account of the use of their automobile in driving from Bar Harbor, Maine, to Anaheim, Calif., in August 1960.   Their contention is that they returned to Anaheim because the motel at Anaheim was not being properly managed and their presence was necessary.   The respondent does not question the amount, but held, and contends, that this amount represented nondeductible personal, living, or family expenses.

It appears to be the contention of the petitioner that when in early 1960 he sold his home in Redlands, Calif., and traveled by his car and trailer to the east coast of the United States, he was abandoning California as his residence and taking up residence somewhere on the east coast of the United States, and that therefore his travel in August 1960, to take care of the motel at Anaheim constituted travel away from "home" in pursuit of a trade or business within the meaning of section 162(a).   Suffice it to say that we are not satisfied that the petitioner did establish a "home," in any sense of the word, outside of California.   Rather, it seems to us from all the evidence presented that it was the intention of the petitioner to take a pleasure trip of undetermined duration but always with the intention of returning at some time.   The fact that conditions at the motel required his return from such pleasure trip earlier than had been anticipated does not alter the personal character of expenses of the trip.   We hold that the petitioners are not entitled to the claimed deduction of $1,004.70 under section 162(a)(2) of the Code.

The petitioners further contend that $324.70 of the total of $1,004.70 is deductible under section 165(c)(3) of the Code which provides for the deduction of losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft.

It is well established that the term "casualty" as used in the statute

---

[13] It should be pointed out that the operation of the motel was the only trade or business carried on by the petitioner.   Although he had interests elsewhere, namely, certain investments in Los Angeles, West Hollywood, Sherman Oaks, and San Bernardino which required some traveling to those places, the management of such investments did not constitute the carrying on of a trade or business.   See *Whipple* v. *Commissioner*, 373 U.S. 193.

means "an accident, a mishap, some sudden invasion by a hostile agency; it excludes the progressive deterioration of property through a steadily operating cause." *Fay* v. *Helvering*, (C.A. 2) 120 F. 2d 253. See also *United States* v. *Rogers*, (C.A. 9) 120 F. 2d 244; *Matheson* v. *Commissioner*, (C.A. 2) 54 F. 2d 537; *Leslie C. Dodge*, 25 T.C. 1022; and *Rudolf Lewis Hoppe*, 42 T.C. 820. The only evidence presented by the petitioner on this issue is his testimony to the effect that due to moving a heavy trailer hurriedly across the country he incurred expenses which he charged to casualties, which included some expense due to several tire blowouts. In his original return he indicated that the tire blowouts were due to overloading the trailer. Accordingly, it does not appear that any loss resulting from tire blowouts was occasioned by any accident, or invasion of any hostile agency. In addition, insofar as appears from the record any such loss may have resulted from the progressive deterioration of the tires. There is no evidence to show what the other claimed casualty losses were. Upon the record here presented, we cannot conclude that the petitioners are entitled to any deduction under section 165 (c) (3) of the Code.

The petitioners contend that they are entitled to deduct for 1959 as charitable contributions under section 170 of the Code, the amount of $172.09 on account of the use of their automobile and $41.37 expended by the petitioner for certain meals consumed by him while performing services for charitable and religious organizations.

Section 170 of the Code provides in part as follows:

(a) ALLOWANCE OF DEDUCTION.—

(1) GENERAL RULE.—There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. * * *

\*  \*  \*  \*  \*  \*  \*

(c) CHARITABLE CONTRIBUTION DEFINED.—For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of— [described organizations]

Section 1.170–2 of the Income Tax Regulations provides in part as follows:

(a)(1). A deduction is allowable to an individual under section 170 only for charitable contributions actually paid during the taxable year, regardless of when pledged and regardless of the method of accounting employed by the taxpayer in keeping his books and records. * * *

(2) No deduction is allowable for contribution of services. However, unreimbursed expenditures made incident to the rendition of services to an organization contributions to which are deductible may constitute a deductible contribution. For example, the cost of a uniform without general utility which is required to be worn in performing donated services is deductible. Similarly, out-of-pocket transportation expenses necessarily incurred in rendering donated services are deductible. Reasonable expenditures for meals and lodging necessarily incurred while away from home in the course of rendering donated services also are deductible. For the purposes of this section, the phrase "while

away from home" has the same meaning as that phrase is used for purposes of section 162.

The respondent disallowed the amount claimed on account of cost of meals and $69.79 of the amount claimed on account of the use of the automobile. The amount which he allowed on account of the automobile, $102.30, was computed at the rate of 6 cents per mile and was determined by him to be the out-of-pocket expenses incurred in operating the automobile. The parties apparently agree that the remainder of $69.79 was determined by the respondent to be depreciation on the automobile and therefore not out-of-pocket expense.

It is to be noted that section 170 of the Code refers to the deduction of any charitable contribution, *payment* of which is made within the taxable year.

The specific language of the statute "payment of which is made within the taxable year" was first enacted by the Revenue Act of 1938 and the purpose was to put accrual method taxpayers in the same position, insofar as deductions for contributions is concerned, as cash method taxpayers, requiring that in the case of either type of taxpayer there be an actual payment in the taxable year. See H. Rept. No. 1860, 75th Cong., 3d Sess., p. 19. Consistently, the regulations provide that a deduction is allowable to an individual under section 170 only for charitable contributions *actually paid* during the taxable year. Thus the regulations provide for the deduction of *expenditures* and *out-of-pocket* transportation expenses incurred in the taxable year in rendering donated services, but specifically provide that no deduction is allowable for contribution of services. The regulations do not specifically refer to depreciation, but the respondent contends that the statute and the regulations do not authorize a deduction for depreciation.[14] We agree. Depreciation is a "decrease in value." *Massey Motors, Inc.* v. *United States*, 364 U.S. 92. It is not a payment, or expenditure, or an out-of-pocket expense. Hence, it cannot be considered as a contribution, payment of which is made within the taxable year. This was the view adopted in *Orr* v. *United States*, (M.D. Ala.) 226 F. Supp. 809. See also *Maurice S. Gordon*, 37 T.C. 986, in which we held that depreciation upon an automobile used to transport the taxpayer's dependent son to a doctor did not constitute an *expense paid* for medical care within the meaning of section 213 of the Code, ap-

---

[14] The administrative construction of the charitable contribution provisions of the various revenue acts has always been that there must be some payment, either to the charitable organization or on its behalf. Thus, as early as O.D. 712, 3 C.B. 188, it was held that charitable contributions contemplate gifts of money or property and not the value of services rendered to charitable organizations. See also I.T. 3918, 1948–2 C.B. 33 ; Rev. Rul. 162, 1953–2 C.B. 127 ; Rev. Rul. 56–508, 1956–2 C.B. 126 ; Rev. Rul. 58–279, 1958–1 C.B. 145 ; and Rev. Proc. 64–15, 1964–1 C.B. In the last two cited rulings the position was taken that a charitable deduction is not allowable for the fair rental value of the use of a taxpayer's automobile in rendering services to a charitable organization or for the depreciation on the automobile occasioned by such use.

proving the regulations thereunder which interpret the statute as permitting deductions only for "medical expenses actually paid." We accordingly conclude that the respondent properly disallowed as a charitable contribution that portion of the amount claimed on the automobile which represented depreciation.

Nor, in our opinion, is the petitioner entitled to deduct as a charitable contribution the amount expended for meals, consumed by him, while performing services for the charitable and religious organizations. Section 262 of the Code provides that, except as otherwise expressly provided, no deduction shall be allowed for personal, living, or family expenses. There can be no question that normally the cost of meals is a personal or living expense. The only section of the Code expressly allowing the deduction of the cost of meals is section 162(a)(2) dealing with traveling expenses while away from home in the pursuit of a trade or business. However, the Income Tax Regulations under section 170 of the Code provide that reasonable expenditures for meals and lodging necessarily incurred while away from home in the course of rendering donated services are deductible as charitable contributions, and that the phrase "while away from home" has the same meaning as it has when used in section 162. For purpose of the application of the regulations the respondent apparently determined that Redlands was the petitioners' "home" and that the petitioner was not away from Redlands when the cost of the meals was incurred. The petitioner apparently does not dispute that for this purpose Redlands was his "home," and yet has not shown that he was away from such "home" when the cost of the meals was incurred. He has thus failed to show that he is entitled to any deduction by virtue of the provisions of this regulation. The petitioner argues that the cost of the meals was directly attributable to the rendition of his services to the charitable and religious organizations and that therefore under the statute and the regulations such cost is deductible. We cannot accept this view. As stated, the cost of meals is essentially a personal or living expense and there is no statutory provision expressly permitting the deduction of such cost under these circumstances.

*Decision will be entered under Rule 50.*