KENNETH D. LaCROIX AND RHETTA S. LaCROIX, ET AL.[1], PETITIONERS
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5128–71—5130–71, 5133–71—5135–71, 5138–71—5145–71,
5154–71, 5218–71, 7886–71.   Filed January 17, 1974.

---

[1] Proceedings of the following petitioners are consolidated herewith : Kenneth L. Lorenz and Florence H. Lorenz, docket No. 5129–71 ; Orville W. Bottorff and Martha L. Bottorff, docket No. 5130–71 ; Robert L. Duey and Nancy T. Duey, docket No. 5133–71 ; Robert E. Washbon and Margaret C. Washbon, docket No. 5134–71 ; John H. Ryan and Lois L. Ryan, docket No. 5135–71 ; Charles H. Ransom and Billie N. Ransom, docket No. 5138–71 ; Charles W. Plows and Nancy H. Plows, docket No. 5139–71 ; Peter W. Melitz and Virginia W. Melitz, docket No. 5140–71 ; Lyle G. Shelton, docket No. 5141–71 ; Joseph B. LaMonica and Arva L. LaMonica, docket No. 5142–71 ; Byron D. Williams and Frances T. Williams, docket No. 5143–71 ; John C. Davenport and Ina C. Davenport, docket No. 5144–71 ; Richard W. Daby and Gladys M. Daby, docket No. 5145–71 ; Site-Pak Development Corporation, docket No. 5154–71 ; Milton A. Miner and Kathleen N. Miner, docket No. 5218–71 ; DeWayne H. Wohlleb and Marilyn A. Wohlleb, docket No. 7886–71.

The following three related petitions were dismissed on motion of petitioners' counsel: Clyde C. Chivens and Dorothy Chivens, docket No. 5131–71 ; Orville W. Cole and Florence Cole, docket No. 5132–71 ; Howard M. Lang, docket No. 5136–71.

*George L. Rogers*, for the petitioners.

*Earl Goldhammer* and *O. Richard Skopil*, for the respondent.

STERRETT, *Judge:* The Commissioner determined deficiencies in petitioners' Federal income tax as follows:

| Petitioners | Docket No. | Deficiency |
| --- | --- | --- |
| Kenneth D. LaCroix and Rhetta S. LaCroix | 5128–71 | $3, 002. 00 |
| Kenneth L. Lorenz and Florence H. Lorenz | 5129–71 | 2, 415. 00 |
| Orville W. Bottorff and Martha L. Bottorff | 5130–71 | 2, 541. 00 |
| Robert L. Duey and Nancy T. Duey | 5133–71 | 8, 263. 00 |
| Robert E. Washbon and Margaret C. Washbon | 5134–71 | 1, 830. 11 |
| John H. Ryan and Lois L. Ryan | 5135–71 | 2, 461. 00 |
| Charles H. Ransom and Billie N. Ransom | 5138–71 | 2, 155. 00 |
| Charles W. Plows and Nancy H. Plows | 5139–71 | 3, 689. 00 |
| Peter W. Melitz and Virginia W. Melitz | 5140–71 | 1, 876. 00 |
| Lyle G. Shelton | 5141–71 | 2, 589. 00 |
| Joseph B. LaMonica and Arva L. LaMonica | 5142–71 | 2, 397. 00 |
| Byron D. Williams and Frances T. Williams | 5143–71 | 1, 387. 00 |
| John C. Davenport and Ina C. Davenport | 5144–71 | 3, 317. 00 |
| Richard W. Daby and Gladys M. Daby | 5145–71 | 4, 946. 00 |
| Site-Pak Development Corp | 5154–71 | 2, 353. 00 |
| Milton A. Miner and Kathleen N. Miner | 5218–71 | 21, 382. 00 |
| DeWayne H. Wohlleb and Marilyn A. Wohlleb | 7886–71 | 23, 383. 73 |

These deficiencies were determined by the respondent for the calendar year 1967, except for Site-Pak Development Corp.,[2] for which the deficiency determined was for the fiscal year ending March 31, 1968.

Certain issues have either been conceded or were not raised by the petitioners.[3] The issues presented for determination are:

(1) Whether a $250,000 payment made in 1967 pursuant to a land sale contract was prepaid interest for which the Analand partnership, in which the petitioners are partners, is entitled to an interest deduction under section 163(a)[4] for the taxable year in which paid.

(2) Whether citrus trees are tangible personal property within the meaning of section 179 and therefore eligible for an additional first-year depreciation allowance.

---

[2] Site-Pak Development Corp. is a corporation which is the successor in interest to Whitesides, Williams & Coult, Inc., pursuant to a reorganization under sec. 368(a)(1)(C). Whitesides, Williams & Coult, Inc., actually filed the income tax return for the fiscal year ending Mar. 31, 1968, before the reorganization took place.

[3] We note that with respect to petitioners Milton A. Miner and Kathleen N. Miner a claimed medical expense deduction was disallowed in the deficiency notice to the extent of $1,056. With respect to petitioners DeWayne H. Wohlleb and Marilyn A. Wohlleb, a claimed investment expense deduction was disallowed in the deficiency notice to the extent of $3,000 since the respondent determined this payment was incurred in the acquisition of property and thus was a capital expenditure. We do not know whether these petitioners have conceded these respective points; however since no mention of them was made in their respective petitions, other than to place in controversy the entire deficiency, and since no evidence was presented at the hearing, we conclude that respondent's determination on these points must be sustained. Rule 142, Tax Court Rules of Practice and Procedure.

[4] All Code references herein are to the Internal Revenue Code of 1954, as amended and as applicable to the taxable year involved, unless otherwise indicated.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

All the petitioners, except DeWayne H. and Marilyn A. Wohlleb, filed their Federal income tax returns for the calendar year 1967 or the fiscal year ending March 31, 1968, in the case of Site-Pak Development Corp. (formerly Whitesides, Williams & Coult, Inc., in 1968), with the district director of internal revenue at Los Angeles, Calif. DeWayne H. and Marilyn A. Wohlleb filed their Federal income tax return for the calendar year 1967 with the Internal Revenue Service Center, at Ogden, Utah. At the time of the filing of the petitions herein, the petitioners' legal residences, or in the case of Site-Pak Development Corp. (hereinafter Site-Pak), the principal place of business, were as follows:

| | |
|---|---|
| Kenneth D. and Rhetta S. LaCroix | Anaheim, Calif. |
| Kenneth L. and Florence H. Lorenz | Riverside, Calif. |
| Orville W. and Martha L. Bottorff | Newport Beach, Calif. |
| Robert L. and Nancy T. Duey | Do. |
| Robert E. and Margaret C. Washbon | Do. |
| John H. and Lois L. Ryan | Long Beach, Calif. |
| Charles H. and Billie N. Ransom | Anaheim, Calif. |
| Charles W. and Nancy H. Plows | Do. |
| Peter W. and Virginia W. Melitz | Encino, Calif. |
| Lyle G. Shelton | Laguana, Calif. |
| Joseph B. and Arva L. LaMonico | Tustin, Calif. |
| Byron D. and Frances T. Williams | Newport Beach, Calif. |
| John C. and Ina C. Davenport | Garden Grove, Calif. |
| Richard W. and Gladys M. Daby | Sacramento, Calif. |
| Site-Pak Development Corp | Brea, Calif. |
| Milton A. and Kathleen N. Miner | Los Angeles, Calif. |
| DeWayne H. and Marilyn A. Wohlleb | Sacramento, Calif. |

In all cases, the spouses are petitioners herein solely by reason of having filed a joint return.

In 1967 Whitesides, Williams & Coult, Inc. (now Site-Pak and hereinafter referred to as Whitesides, Inc., for the years prior to its reorganization), provided investment counseling and estate-planning services to its clients. As part of its services, Whitesides, Inc., sought out economically sound investments which would serve as tax shelters. Whitesides, Inc., normally arranged from five to seven of such real estate projects a year.

### Prepaid Interest

Casualty Insurance Co. of California (hereinafter Casualty) was in the insurance business. In 1967 Casualty was the owner of an office

building located at 1477 South Manchester Avenue, Anaheim, Calif. (hereinafter the Manchester property), which it occupied and used in its business.

The Manchester property was encumbered by a deed of trust executed on February 23, 1967, which secured a promissory note of the same date. The deed of trust named Casualty as trustor and California Federal Savings & Loan Association (hereinafter California Federal) as beneficiary. The promissory note was payable in installments of $6,560 a month, and the approximate balance of the Loan on December 14, 1967, was $990,000.

Under the terms of the deed of trust and the promissory note, if Casualty prepaid any amount of principal over 20 percent of the original amount of the loan, it would be subject to a prepayment penalty of 6 months' interest. Also if Casualty sold or transferred the property without California Federal's consent, the entire unpaid principal balance, interest, and prepayment charges would become immediately dues and payable.

In 1967 Casualty was experiencing difficulties arising from inadequate cash flow, inadequate reserves as required by the insurance commissioner of the State of California, and other financial problems. As a result, Casualty decided to sell the Manchester property. During 1967, Whitesides, Inc., was made aware of Casualty's desire to sell the Manchester property and, after investigation, Whitesides, Inc., believed that a purchase of this property would be the sort of investment package for which its clients, the petitioners herein, and a few others, were looking.

After extensive negotiations, Casualty and Whitesides, Inc., agreed upon the terms of sale. The form of the sale was a land sales contract. On October 17, 1967, escrow instructions to Stewart Title Co. of Orange County (hereinafter Stewart) were executed on behalf of Casualty and Whitesides, Inc. Such escrow provided, among others, the following terms and conditions:

I will hand you $250,000, representing *prepaid interest* only * * * to apply on the total purchase price per contract of sale of $1,300,000 * * *

This escrow is contingent upon the approval of the Insurance Commissioner of the State of California approval of the contract to be delivered herein and is further contingent upon delivery to escrow of a lease satisfactory to the principals herein * * *

Purchaser herein will execute a note secured by Deed of Trust in the amount of $1,300,000 * * *

The sums deposited herein by purchaser, in the amount of the total $250,000, is to represent *prepaid interest* only * * * [Emphasis supplied.]

These escrow instructions were amended to show that verbal approval was received by the insurance commissioner pursuant to the original escrow instructions. On October 17, 1967, Whitesides, Inc., deposited

$10,000 in the escrow account and again on December 12, 1967, Whitesides, Inc., deposited $240,170 therein.

On December 12, 1967, Casualty and Whitesides, Inc., executed two contracts captioned "Agreement for Sale of Real Estate" and "Lease Agreement" with respect to the Manchester property. The "Lease Agreement" provided for a monthly lease payment of $9,867 for a 10-year term. The "Agreement for Sale of Real Estate" provided in part as follows:

WITNESSETH: That the said Sellers * * * agree to sell * * * and said Buyers agree to buy * * * for the sum of One Million, Three Hundred Thousand and No/100 Dollars ($1,300,000.00) * * * and the Buyer, in consideration of the premises, promises and agrees to pay the Seller the aforesaid sum of money, for all of said real property, as follows, to wit: Two Hundred, Fifty Thousand ($250,000.00) Dollars on or before November 17, 1967 and/or in accordance with Escrow Instructions numbered 4073-M Stewart Title Company of Orange, California, said Two Hundred, Fifty Thousand Dollars representing *prepayment of interest* on the balance due hereunder, and the balance of One Million, Three Hundred Thousand Dollars in installments, including *interest* on all unpaid principal from close of escrow mentioned above until date of payment at the rate of six and six-tenths (6.6%) percentum per annum. The first installment of Eight Thousand, Two Hundred ($8,200.00) Dollars due thirty days from the close of escrow mentioned aforesaid and a like amount shall be paid on the same day of each consecutive month thereafter until the balance of principal and *interest* has been paid in full. The amount of the final payment, however, shall be the total of the principal and interest then due. All payments to be made by the Buyer shall be paid with lawful money of the United States of America. On the following dates and in the following amounts, credit will be given for *interest paid in advance* by reducing the then outstanding principal balance due on the $1,300,000 purchase price:

Jan. 1, 1969—$25,000; Jan. 1, 1970—$25,000; Jan. 1, 1971—$25,000; Jan. 1, 1972—$25,000; Jan. 1, 1973—$25,000; Jan. 1, 1974—$25,000; Jan. 1, 1975—$25,000 and Nov. 1, 1975—$75,000.

\* \* \* \* \* \* \*

THIRD: Grant Deed. The seller at such time as it has received sufficient payments of principal, including credits given or to be given from *prepaid interest* thereon, so that the principal amount due under the above mentioned obligation of Buyer to Seller equals the principal balance owed by Seller to California Federal Savings and Loan Association on loan number 349–98601, shall execute a grant deed to said property in favor of Buyer and shall deliver said deed to Buyer * * *

In the event of (a) the appointment of a receiver to take possession of all or substantially all of the assets of Seller; (b) a general assignment by Seller for the benefit of creditors; (c) any breach of that lease between the parties executed concurrently herewith concerning subject property, or (d) at any time in the sole discretion of Buyer, the Buyer shall have the option to have credited all or any portion of the remaining *prepaid interest* referred to above on principal due on the obligation of $1,300,000.00, provided that Buyer shall have previously or simultaneously therewith paid to Seller any balance of principal due between (1) the said obligation between Buyer and Seller and (2) the principal amount owed by Seller to California Federal Savings and Loan Association, loan number

349–98601. In such event 'Seller shall execute a grant deed to said property in favor of Buyer and shall deliver said deed to Buyer, and both parties agree to comply fully and completely with all of the other terms and conditions involved therewith as defined by this paragraph. [Emphasis supplied.]

This "Agreement for Sale of Real Estate" was reviewed by Lawrence A. Whitesides, George E. Coult, and Robert T. Little, respectively, the president, vice president, and tax adviser of Whitesides, Inc.

Whitesides, Inc., and Casualty adopted the "wraparound" mortgage and land sale contract form of sale in order to avoid the prepayment penalty clause and the acceleration clause contained in the deed of trust and promissory note between Casualty and California Federal. This form of sale avoided the need of refinancing the preexisting loan by California Federal to Casualty at the 6-percent interest rate which Whitesides, Inc., considered favorable. The current market rate for interest in October 1967 was 8 percent per annum.

Paragraph Third of the "Agreement for Sale of Real Estate" was included to protect Whitesides, Inc., against loss of its prepayments of interest. Whitesides, Inc., was concerned about Casualty's poor financial condition, and it believed that an automatic credit against the principal balance of its loan from Casualty was more valuable to it than a refund since Casualty might not be in a position to pay the large amount of cash required by a refund. Likewise, the mechanism provided in the provision for periodic crediting against the principal balance of "interest paid in advance" was included to protect Whitesides, Inc., from Casualty's poor financial condition.

On December 14, 1967, Stewart Title issued an escrow closing statement to Casualty and Whitesides in which the $250,000 payment was referred to as "prepaid interest."

On December 14, 1967, a document captioned "Agreement and Certificate of Limited Partnership" was executed by Lawrence A. Whitesides and Kathryn G. Weinmann for Whitesides, Inc., "The General Partner," and by the 20 limited partners, 16 of whom are the remaining petitioners in the instant case (petitioner Site-Pak herein was formerly Whitesides, Inc.). The agreement provided that the name of the partnership would be "Analand, a Limited Partnership" (hereinafter Analand).

On December 15, 1967, Whitesides, Inc., assigned its rights in the "Agreement for Sale of Real Estate" and in the "Lease Agreement" to Analand.

The books and records of Analand show that on each January 1, 1969, and January 1, 1970, $25,000 was credited to the principal balance owing to Casualty as an "Application of ppd interest." These books and records do not show the title of the account from which the $25,000 was credited. Casualty's books and records, however, show that an account labeled "Prepaid interest on real estate sold under contract"

into which the $250,000 prepaid interest was placed, was reduced by $25,000 each time the principal balance was reduced by the $25,000 credits in 1969 and 1970.

On its 1967 Federal partnership return of income, Analand, a cash basis taxpayer,[5] reported a loss of $230,847. On the same return it claimed a deduction for interest expense in the amount of $250,000. Each of the partners of Analand deducted on his Federal income tax return for the taxable year 1967 (March 31, 1968, for Whitesides, Inc.) his proportionate share of the partnership's claimed loss as provided in the partnership agreement.

In January of 1971 the Manchester property was sold for $1,389,000. At that time according to the escrow statement reflecting the sale, Analand received $200,000 as a credit for prepaid interest. Analand reported the $200,000 credit as interest income on its Federal partnership return of income for 1971.

The respondent disallowed each petitioner's share of the loss from the Analand partnership claimed on his respective 1967 Federal income tax returns (March 31, 1968, for Whitesides, Inc., now Site-Pak) because it was not established the $250,000 represented interest paid by Analand in the year 1967.

### Citrus Trees

The following petitioners were partners in the partnership or partnerships listed below during the taxable year 1967:

| Petitioner | Partnership(s) |
| --- | --- |
| Byron D. Williams | Highland View Citrus Orchard; University Acres. |
| DeWayne H. Wohlleb | Highland View Citrus Orchard. |
| Kenneth D. LaCroix | Highland View Citrus Orchard; University Acres. |
| Orville W. Cole | Highland View Citrus Orchard. |
| Milton A. Miner | Highland View Citrus Orchard. |
| Site-Pak Development Corp. (in 1967 Whitesides, Williams & Coult, Inc.) | Highland View Citrus Orchard. |

The partnerships mentioned above owned citrus trees in 1967 and deducted certain amounts as additional first-year depreciation under section 179 on these citrus trees. As a result, the income or loss from these partnerships reported by the above-mentioned petitioners for the taxable year 1967 (March 31, 1968, for Whitesides, Inc.) was affected.

The respondent disallowed the additional first-year depreciation deductions and thus increased each petitioner's respective distributive share or shares by his proportionate share of the disallowed amounts.

---

[5] Although neither party stated the method of accounting used, we have concluded that because of the nature of the issue involved and after analysis of the partnership return of income, Analand was on the cash method of accounting.

The respondent determined that citrus trees do not qualify as "section 179 property" because they are not tangible personal property within the meaning of that section.

OPINION

The first issue for decision is whether the $250,000 payment made in 1967 by Analand, a Limited Partnership, to Casualty Insurance Co. of California is deductible under section 163 as interest paid on indebtedness. If Analand is not entitled to the deduction, it must report taxable income rather than a loss for the taxable year 1967. Consequently, each of its partners, among whom are the petitioners herein, must report his respective distributive share of the income of said partnership rather than his share of the loss generated by the claimed interest deduction.

In the instant case, Whitesides, Williams & Coult, Inc., arranged a tax shelter investment package for some of its clients. Whitesides, Inc., purchased an office building from Casualty for $1,300,000 under a land sale contract entitled "Agreement for Sale of Real Estate" (hereinafter the agreement) and immediately assigned its rights and interests therein to the newly created partnership Analand. Whitesides, Inc. (now Site-Pak Development Corp.), was the general partner and the remaining petitioners were among the 20 limited partners. The office building was leased back to Casualty at the same time as the agreement was executed.

According to the agreement, the buyer would pay $250,000 which represented a "prepayment of interest on the balance due" of $1,300,-000 at closing and would pay no downpayment. The buyer agreed to pay monthly installments of $8,200 which would consist of interest at 6.6 percent per annum on the unpaid balance and of principal. On certain dates according to the agreement, "credit will be given for interest paid in advance by reducing the then outstanding principal balance due on the $1,300,000 purchase price." The total amounts to be credited equaled $250,000.

Since the sale was in the form of a land sale contract with a "wraparound" mortgage and included a large "prepayment of interest," the buyer wished to protect itself from the seller's poor financial condition. Consequently, the parties further contracted in the agreement that the buyer would receive a grant deed on the occurrence of certain events. In one instance, the buyer would receive a grant deed when the seller had received sufficient payments of principal, "including credits given or to be given from prepaid interest," so that the principal amount due the seller equaled the remaining balance of a preexisting and outstanding loan on the building made by California Federal to Casualty. Also, in the case of receivership of the seller or at the sole discretion of the

buyer or on the occurrence of certain other events, the buyer had the option "to have credited all or any portion of the remaining prepaid interest referred to above on principal due" provided the buyer also pays the remaining principal due. In such case, the buyer would receive a grant deed.

The respondent disallowed the $250,000 interest deduction on the grounds that such payment was not interest paid on indebtedness. The respondent herein does not contend that the loan to the buyer was not genuine indebtedness in that it was a sham, rather he contends that the payment was not interest but was in substance a deposit or downpayment on the principal due.[6] The petitioners herein argue principally that this $250,000 payment was actually 3 years of prepaid interest and that the credits against principal in the agreement to be given for "interest paid in advance" or for "prepaid interest" refer only to the 6.6-percent interest paid in periodic monthly installments and not to the $250,000 "prepayment of interest." Petitioners alternately argue that even if the respondent's interpretation of the agreement is correct, the $250,000 interest deduction should nevertheless be allowed as resort to the tax-benefit rule, which they claim would require inclusion of the credited amounts in later years, is the method with which the respondent should deal with the problem.

Section 163(a) provides that, "There shall be allowed as a deduction all *interest paid* or accrued within the taxable year on indebtedness." (Emphasis supplied.) Petitioners bear the burden of proving that the payment in issue constituted interest on indebtedness within the meaning of section 163. *James A. Collins*, 54 T.C. 1656, 1661 (1970).

In the instant case, the respondent does not content that the $1,300,000 loan was not a genuine debt or that the $250,000 was not paid in 1967. However, the fact that a $250,000 payment was made alone does not satisfy the requirements of section 163. The Supreme Court noted in *United States* v. *Consolidated Edison Co. of New York, Inc.*, 366 U.S. 380, 391 (1961):

"Payment" is not a talismanic word. It may have many meanings depending on the sense and context in which it is used. As correctly observed by the Court of Appeals, "A payment may constitute a capital expenditure, an exchange of assets, a prepaid expense, *a deposit*, or a current expense," * * * (Emphasis added.)

Thus, the question for our determination is whether this $250,000 payment was "interest" within the meaning of section 163. Such term requires that the $250,000 be compensation paid for the use or forbearance of money. *Deputy* v. *DuPont*, 308 U.S. 488, 498 (1940); *Norman Titcher*, 57 T.C. 315, 322 (1971).

---

[6] We note here that in the taxable year 1967 I.T. 3740, 1945 C.B. 109, was in effect. I.T. 3740 allowed a cash basis taxpayer to deduct in the year of payment, interest prepayments for periods not in excess of 5 years. I.T. 3740 was subsequently revoked in 1968 by Rev. Rul. 68–643, 1968–2 C.B. 76, which stated that such revocation would not be given retroactive effect. See sec. 7805(b).

Petitioners herein point to the fact that the $250,000 payment was described as a prepayment of interest in the escrow instructions, the escrow statements, the agreement, and on the books and records of both Analand and Casualty. They contend that dispositive weight should be given to the characterization of the payment in these documents. However, it is clear from case law that it is the true nature of the payment made and not the label affixed thereto which is controlling. *Autenreith* v. *Commissioner*, 115 F. 2d 856, 858 (C.A. 3, 1940), affirming 41 B.T.A. 319 (1940); *Norman Titcher*, *supra* at 326; *L–R Heat Treating Co.*, 28 T.C. 894, 897 (1957).

We recognize the legal right of a taxpayer to decrease or avoid his taxes, but the action taken by a taxpayer in this pursuit, apart from the tax motive, must be that which the statute intended. *Gregory* v. *Helvering*, 293 U.S. 465, 469 (1935). In effect, the substance of a transaction controls over its form. With the foregoing precepts in mind we are compelled to the conclusion that the $250,000 payment herein was not "interest" on indebtedness as contemplated by section 163.

In *Titcher* (at p. 322), this Court stated, "It is also well settled that in determining whether a payment constitutes 'interest * * * on indebtedness' economic realities govern over the form in which a transaction is cast." After considering the economic realities in the instant case, we conclude that the $250,000 was in substance a deposit or downpayment on the $1,300,000 principal due. As did the Court in *Titcher*, we find it difficult to believe that there was no downpayment on so large a purchase price. Furthermore, Analand and Casualty agreed upon a 6.6-percent interest rate while the current market rate was 8 percent in 1967. We believe that it is more than a coincidence that 6.6 percent of $1,300,000 nearly equals 8 percent of $1,050,000, or the $1,300,000 purchase price less the $250,000 "prepayment of interest."

Petitioners argue that the agreement is ambiguous and that actually the $250,000 payment was 3 years of prepaid interest which was to be credited as current interest each year before the 6.6-percent periodic interest payments would be used. They further contend that the credits against principal to be taken under the agreement for "interest paid in advance" or for "prepaid interest" refer only to the 6.6-percent interest paid in periodic monthly installments. To this end, petitioners offered the testimony of the three employees of Whitesides, Inc., who negotiated and were responsible for the contract. Petitioners also presented a letter signed in 1970 by employees of both Site-Pak (formerly Whitesides, Inc.) and Casualty which attempted to clarify the agreement and which supported petitioners' position.

We believe that the agreement is logically read to equate the $250,000 "prepayment of interest" with the "advance payment of interest" and with the "prepaid interest" either of which would eventually be

credited against the principal. Whitesides, president of Whitesides, Inc., in 1967, stated in his testimony that the $250,000 payment as well as the 6.6-percent periodic interest payments could be credited against principal. The books and records of Analand are uninformative as to what account the credits to principal were made from. However, the books and records of Casualty showed that the $25,000 credits against principal for the advance payment of interest were drawn from the account which contained the $250,000 prepayment of interest. In light of the treatment of the $250,000 payment on the books and records of Casualty and the fact that the 1970 letter of clarification between Site-Pak and Casualty was written after the Internal Revenue Service started its investigation of the matter, we accord said letter little weight. It is our conclusion that the $250,000 payment in substance was not "interest" within the meaning of section 163 but was merely an artifact to provide petitioners with a means of lowering their taxes.

Petitioners further argue that even if this $250,000 "prepayment of interest" would necessarily be credited against principal in some future years, it is presently deductible as interest, and, under the tax-benefit rule, no revenue would be lost as the recovered amounts (the amounts credited) would be included in income in these later years. See *Dobson* v. *Commissioner*, 320 U.S. 489 (1943). However, this argument misses the point of the tax-benefit rule and of tax accounting. The tax-benefit rule is an exception to the accounting principle that recoveries are taxed in the year of recovery. However, this accounting principle applies only to items which were *properly* deducted in prior years. For items improperly deducted, the correction should be made by elimination of the items from the year in which taken through the use of an amended return or a timely deficiency notice. Recovery of previously, but improperly, deducted items are not required to be included in income in the year of recovery.[7] *Adolph B. Canelo III*, 53 T.C. 217, 226-227 (1969), affirmed per curiam 447 F. 2d 484 (C.A. 9, 1971); *Streckfus Steamers, Inc.*, 19 T.C. 1, 8 (1952); cf. *B.C. Cook & Sons, Inc.*, 59 T.C. 516, 521 (1972). The tax-benefit rule or the accounting principle to which it is an exception will not allow the Internal Revenue Service to open years closed by the period of limitations. *Id.*

In the instant case, it was improper to deduct this item in 1967 as we have determined that it was not interest but only a downpayment or deposit. We realize that in many cases there is a fine line to be drawn between what are proper deductions based upon reasonable estimates of the law and the circumstances and between improper deductions. But in the instant case, if we were to allow the petitioners

---

[7] We note that in certain cases, a taxpayer may be estopped by his own conduct from using this defense of the noninclusion in the year of recovery of a prior year's improper deduction. See *Mayfair Minerals, Inc.*, 56 T.C. 82 (1971), affd. 456 F. 2d 622 (C.A. 5, 1972). This exception to the rule is clearly not applicable here.

to defer payment of taxes, by merely labeling a payment, which was certain to be refunded or credited in future years, as a "prepayment of interest" and then relying upon the tax-benefit rule to save them, we would be seriously jeopardizing the annual accounting concept. We would be sanctioning what would clearly be a distortion of income.

As we have determined that the $250,000 payment was a deposit_ or downpayment, Analand is not entitled to a $250,000 interest deduction for 1967. Since the credits against principal of the $250,000 have already been taken into income, we note in passing that petitioners' remedy is either to file an amended return if within the period of limitations or to employ section 1311.

The second issue for decision is whether citrus trees qualify for the additional first-year depreciation allowance provided by section 179. The dispute here basically revolves around the issue of whether citrus trees fall within the classification of "tangible property" as that term is used in the definition of "section 179 property." If citrus trees are "tangible personal property," since the respondent does not claim herein that the other prerequisites to classification as "section 179 property" are not met, the partnerships, of which certain of the petitioners are partners, will be entitled to an additional first-year depreciation allowance on said citrus trees.

To support their additional first-year depreciation claims, the petitioners argue that section 179 in its definition of "section 179 property" is as broad as or broader than section 48 in its definition of "section 38 property," under which the Internal Revenue Service has ruled that citrus trees are "section 38 property."[8] Thus, petitioners conclude that citrus trees qualify for section 179 treatment. Petitioners also argue that, even if we find that section 179 is not as broad as section 48 in its definition of eligible property, citrus trees are still "tangible personal property" within the meaning of section 179. The respondent takes the opposite position on both points. We note that these questions have been presented for judicial determination only once previously. See *Powars* v. *United States*, 285 F. Supp. 72 (C.D. Cal. 1968). We agree with the conclusions reached in *Powars* that section 179 is not as broad as section 48 in the respective definitions of qualifying property and that citrus trees are not "tangible personal property" within the meaning of section 179.

---

[8] In Rev. Rul. 65-104, 1965-1 C.B. 28, the Service ruled that citrus trees qualified as "section 38 property" without stating whether they were "tangible personal property" within the meaning of sec. 48(a)(1)(A) or "other tangible property" within sec. 48(a)(1)(B). However, in Rev. Rul. 67-51, 1967-1 C.B. 68, the Service stated that trees of first orchards or groves were not "tangible personal property" within the meaning of sec. 179 but that they could qualify as "other tangible property" under sec. 48(a)(1)(B).

Section 179(d)(1)[9] provides, along with other requirements, that "section 179 property" must be "tangible personal property." The Code does not define this term but section 1.179-3(b), Income Tax Regs., elaborates on its definition as follows:

*Tangible personal property.* Local law definitions will not be controlling for purposes of determining the meaning of the term "tangible personal property" as it is used in section 179 and the regulations thereunder. For purposes of section 179, the term "tangible personal property" includes any tangible property except land, and improvements thereto, such as buildings or other inherently permanent structures thereon (including items which are structural components of such buildings or structures). Assets accessory to the operation of a business, such as machinery, printing presses, transportation or office equipment, refrigerators, individual air conditioning units, grocery counters, etc. generally constitute tangible personal property for purposes of section 179, even though such assets may be termed fixtures under local law. The term does not include, for example, the wiring in a building, plumbing systems, nor central heating or central air conditioning machinery, pipes, or ducts or other items, which are structural components of a building or other permanent structure, nor does the term include trademarks, goodwill, or other intangibles.

We note that in addition to authority under section 7805 to prescribe all needful rules and regulations these regulations were promulgated under section 179(e) wherein the respondent is instructed to prescribe regulations necessary to carry out the purposes of section 179. These regulations, unless unreasonable or plainly inconsistent with the revenue statute, must be sustained and have the force and effect of law. *Commissioner* v. *South Texas Co.*, 333 U.S. 496, 501 (1948) ; *Maryland Casualty Co.* v. *United States*, 251 U.S. 342, 349 (1920) ; cf. *Edward A. Moradian*, 53 T.C. 207, 210 (1969). We do not find the regulations to be unreasonable or inconsistent with the statute.

Although the legislative history of section 179 is meager, we are convinced that in using the term "tangible personal property," Congress intended to exclude all real property, except for some fixtures or equipment which under local law may be classified as real property but for Federal tax purposes would be classified as personal property. In a summary of the proposed provision, later to become section 179, during debate in the Senate, the provision was stated to be applicable to "depreciable equipment" only. 104 Cong. Rec. 17090 (1958). One of the critics of the proposed provision objected to limiting its scope to only personal property and offered an amendment,

---

[9] Sec. 179(d)(1) provides as follows:

(d) DEFINITIONS AND SPECIAL RULES.—

(1) SECTION 179 PROPERTY.—For purposes of this section, the term "section 179 property" means tangible personal property—

(A) of a character subject to the allowance for depreciation under section 167,

(B) acquired by purchase after December 31, 1957, for use in a trade or business or for holding for production of income, and

(C) with a useful life (determined at the time of such acquisition) of 6 years or more.

subsequently rejected, which would have applied to both real and personal property as well as to inventory. 104 Cong. Rec. 17095–17098 (1958).

The term "tangible personal property" is used elsewhere in the Code. In section 48(a) (1)[10] the provisions relating to the investment credit employ it in the definition of "section 38 property." The term "personal property" is also used to define "section 1245 property" in section 1245(a) (3),[11] and, according to the regulations, includes both tangible and intangible property. Sec. 1.1245–3(b), Income Tax Regs. However, since section 1.1245–3(b) (1), Income Tax Regs., defines "tangible personal property" for section 1245 purposes as that defined in section 1.48–1(c), Income Tax Regs., we need only consider the use of that term in section 48 in order to gain further insight into the application of the term to the facts of the instant case.

Several decisions of this Court have concluded that the definitions of "tangible personal property" in sections 1.48–1(c)[12] and 1.179–3(b),

---

[10] Sec. 48(a) (1) provides, in pertinent part, as follows:

(a) SECTION 38 PROPERTY.—

(1) IN GENERAL.—Except as provided in this subsection, the term "section 38 property" means—

(A) tangible personal property, or

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or

[11] Sec. 1245(a) (3) provides, in pertinent part, as follows:

(3) SECTION 1245 PROPERTY.—For purposes of this section, the term "section 1245 property" means any property which is or has been property of a character subject to the allowance for depreciation provided in section 167 (or subject to the allowance of amortization provided in section 185) and is either—

(A) personal property,

(B) other property (not including a building or its structural components) but only if such other property is tangible and has an adjusted basis in which there are reflected adjustments described in paragraph (2) for a period in which such property (or other property)—

(i) was used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or

[12] Sec. 1.48–1(c), Income Tax Regs., defines "tangible personal property" as follows:

(c) *Definition of tangible personal property.* If property is tangible personal property it may qualify as section 38 property irrespective of whether it is used as an integral part of an activity (or constitutes a research or storage facility used in connection with such activity) specified in paragraph (a) of this section. Local law shall not be controlling for purposes of determining whether property is or is not "tangible" or "personal". Thus, the fact that under local law property is held to be personal property or tangible property shall not be controlling. Conversely, property may be personal property for purposes of the investment credit even though under local law the property is considered to be a fixture and therefore real property. For purposes of this section, the term "tangible personal property" means any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures). Thus, buildings, swimming pools, paved parking areas, wharves and docks, bridges, and fences are not tangible personal property. Tangible personal property includes all property (other than structural components) which is contained in or attached to a building. Thus, such property as production machinery, printing presses, transportation and office equipment, refrigerators, grocery counters,

Income Tax Regs., are substantially identical. *Joseph Henry Moore*, 58 T.C. 1045, 1055 (1972), affirmed per curiam 489 F. 2d 285 (C.A. 5, 1973); *Estate of Shirley Morgan*, 52 T.C. 478, 482 (1969), affirmed per curiam 448 F. 2d 1397 (C.A. 9, 1971). Thus, we conclude that the two terms should be applied in a similar manner.

The petitioners here argue that section 179 is interpreted to be just as broad or broader than section 48 in its definition of eligible property. Petitioners base their argument on section 1.179–3(b), Income Tax Regs., which provides that for section 179 purposes the term "tangible personal property" includes "any tangible property" and that "any tangible property" would include both "tangible personal property" as used in section 48(a)(1)(A) and "other tangible property" as used in section 48(a)(1)(B). Petitioners conclude that since citrus trees are clearly tangible property and since they qualify as "section 38 property," it follows that they qualify as "section 179 property."

However, the legislative history of section 48 and the regulations under sections 48 and 179 do not support petitioners' argument. It is clear that the term "other tangible property" as used in section 48(a)(1)(B) was added so that certain real property, which would not be included under the broadly defined term "tangible personal property," could qualify for the investment credit if used as an integral part of certain enumerated activities. The Senate Finance Committee stated as follows:

*4. "Section 38" property.*—Section 38 property (defined in sec. 48(a)), is the only property (either new or used) which is treated as "qualified investment." Except for the exclusions noted below, all tangible personal property qualifies as section 38 property. Except for buildings and their structural components, real property which is used as an integral part of manufacturing, production or extraction * * * also qualifies as section 38 property. * * * Tangible personal property is not intended to be defined narrowly here, nor to necessarily follow the rules of State law. [S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 722.]

Tangible personal property may qualify as section 38 property irrespective of whether it is used as an integral part of manufacturing, production, or extraction * * *. Local law definitions will not be controlling for purposes of determining the meaning of the term "tangible personal property." For purposes of section 48, the term "tangible personal property" includes any tangible property except land, and improvements thereto, such as buildings or other inherently permanent structures thereon (including items which are structural components of such buildings or structures). [*Id.* at 858.]

testing equipment, display racks and shelves, and neon and other signs, which is contained in or attached to a building constitutes tangible personal property for purposes of the credit allowed by section 38. Further, all property which is in the nature of machinery (other than structural components of a building or other inherently permanent structure) shall be considered tangible personal property even though located outside a building. Thus, for example, a gasoline pump, hydraulic car lift, or automatic vending machine, although annexed to the ground, shall be considered tangible personal property.

In addition to tangible personal property, other tangible property (not including a building and its structural components) used as an integral part of the manufacturing, production, or extraction process * * * may qualify for the credit. * * *

The terms "manufacturing," "production," "extraction," * * * are to be given their commonly accepted meaning. Thus, for example, manufacturing or production includes * * * the cultivation of the soil and the raising of livestock and other farm produce. Section 38 property would include, for example, property used as an integral part of * * * the growing, raising, processing, and packing or packaging of foodstuffs; * * * [Id. at 859.]

We note here again, as we found above, that the legislative history of section 179 shows that real property, as the term is used for tax, rather than local law, purposes, was not intended to be included as "tangible personal property" for section 179 purposes.

Congress, in its use of the term "other tangible property" in section 48, did intend to allow the investment credit for certain real property, in addition to the broadly defined category of personal property, if used as an integral part, as applicable herein, to the cultivation of soil. It is important to note here that the Senate report also defined "tangible personal property" for section 48 purposes as "any tangible property" except land or improvements thereon, as does section 1.179-3(c), Income Tax Regs., upon which petitioners rely, and as does section 1.48-1(c), Income Tax Regs. On the basis of these facts and our determination that the term "tangible personal property" is to be applied similarly in both sections 48 and 179, we conclude that in its definition of "section 38 property" section 48 is broader in scope than is section 179 in its definition of "section 179 property" with regard to the real or personal nature of the eligible property.

Petitioners next argue that citrus trees fall within the classification "tangible personal property." Section 1.179-3(c), Income Tax Regs., defines this term as "any tangible property except land, and improvements thereon, such as buildings or other inherently permanent structures thereon." The respondent has determined that citrus trees do not fall within the classification of "tangible personal property" and we agree.

We have not been directed to, nor have we been able to find, any dispositive discussion of citrus trees with respect to their classification as real or personal property for Federal tax purposes. We note that several cases have allowed depreciation deductions for trees or orchards, but classification as real or personal property was not involved.[13] Thus, we must resort to analogy. In several landscaping

---

[13] See W. Thomas Davis, T.C. Memo. 1965-30, affirmed per curiam without discussion of this point 375 F. 2d 517 (C.A. 9, 1967), certiorari denied 389 U.S. 914 (1967) ; Ribbon Cliff Fruit Co., 12 B.T.A. 13 (1928) ; Kaweah Lemon Co., 5 B.T.A. 992 (1927) ; Redlands Security Co., 5 B.T.A. 956 (1926).

cases, depreciation was denied for the cost of shrubbery because the shrubbery was believed to be "inextricably associated" with land. *Herbert Shainberg*, 33 T.C. 241 (1959); *Algernon Blair, Inc.*, 29 T.C. 1205 (1958). However, in *Alabama-Georgia Syrup Co.*, 36 T.C. 747 (1961), reversed without discussion of this point sub nom. *Whitfield* v. *Commissioner*, 311 F. 2d 640 (C.A. 5, 1962), depreciation was allowed on shrubbery and evergreens, presumably, although it was not stated, because shrubbery and evergreens were no longer considered as land. Respondent himself in Rev. Proc. 62–21, 1962–2 C.B. 418, classified shrubbery and landscaping as land improvements subject to depreciation.[14] We believe that the trees here involved are closely akin to shrubbery and should fall into the same category for tax purposes. Nowhere have we found any indication that shrubbery or trees such as those in the instant case are considered to be personal property for tax purposes, but rather that they are associated with land or thought to be improvements thereon.[15]

"Inherently permanent structures" on land are also excluded from the definition of the term "tangible personal property." In this regard, the following language from *Beverly R. Roberts*, 60 T.C. 861, 866 (1973), which involves "section 38 property," is instructive:

> Tangible assets are thus to be classified as either "personal property" or "other tangible property" depending upon the fashion in which they are affixed to the land and how permanently they are designed to remain in place.

See also *C. C. Everhart*, 61 T.C. 328 (1973); *Joseph Henry Moore, supra; Estate of Shirley Morgan, supra;* cf. *Minot Federal Savings & Loan Assn.* v. *United States*, 435 F. 2d 1368, 1369–1371 (C.A. 8, 1970). We realize that these cases do not involve trees or other living things, but we believe that the principle for which they stand applies equally in the instant case. The trees in the instant case could, no doubt, be separated from the earth or transplanted, but it is doubtful that such was likely or even imagined at the time of planting or acquisition by the petitioners. Since the use of the term "tangible personal property" in sections 48 and 179 is substantially identical, we employ the distinction

---

[14] We realize that respondent also classified citrus trees in Rev. Proc. 62–21 as depreciable assets involved in agriculture; but again such classification gave no indication as to respondent's view of their nature as real or personal property.

[15] While we realize that local law definitions are not necessarily controlling for the purposes of determining whether citrus trees are "tangible personal property" within the meaning of sec. 179, we nevertheless believe that a consistent interpretation is indicative. Congress is not in a position to define completely every term it uses, but in many circumstances must rely upon generally accepted interpretations and definitions. In a survey of cases we found a distinction between fructus industriales, or crops which are the product of human labor and which require periodic planting and cultivation, and fructus naturales, or crops which are the natural products of the soil such as trees in general or trees with growing fruit. The former may be either real or personal property depending upon the jurisdiction, but the latter are consistently held to be real property. See generally 25 C.J.S., Crops, secs. 2 and 3. As citrus trees come within the classification of fructus naturales, they must be considered real property.

stated in *Roberts* in the instant case. While annexation to land does not necessarily preclude classification as "tangible personal property" for section 48 purposes, see *Estate of Shirley Morgan, supra* at 483, we believe that the permanence of the citrus trees in the instant case is of controlling importance.

Because we believe that commonsense dictates that citrus trees or trees in general are more commonly associated with land and because of their inherently permanent nature it is our judgment that citrus trees cannot reasonably be regarded as items of personal property for the purposes of section 179.

Since citrus trees do not qualify as "section 179 property," the partnerships herein are not entitled to an additional first-year depreciation allowance thereon and accordingly those petitioners herein who are partners of these partnerships must increase their respective distributive shares as the respondent has determined.

*Decisions will be entered for the respondent.*