IRWIN HOLTZMAN and NOHEMI HOLTZMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Holtzman v. Commissioner
Docket No. 1373-72.
United States Tax Court
T.C. Memo 1976-251; 1976 Tax Ct. Memo LEXIS 152; 35 T.C.M. (CCH) 1088; T.C.M. (RIA) 760251; August 12, 1976, Filed *152 During 1968 petitioners added $9,000 to a "prepaid interest account" pursuant to an arrangement between petitioner and a bank whereby the bank loaned petitioners 100 percent of the funds used for the purchase of silver bullion. The interest charge incurred for the use of borrowed money during 1968 was $1,571.50. The parties disagree as to the treatment of the remaining $7,428.50, which respondent claims is in the nature of collateral for the purchase of silver, or a deposit for future bullion purchases or future interest, while petitioners contend it is deductible as prepaid interest. Held, the remaining $7,428.50 is not deductible as interest under section 163, I.R.C. 1954. Irwin Holtzman, pro se. Jonathan *153 A. BROD, FOR THE RESPONDENT. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the calendar year 1968 in the amount of $1,770.46. The parties have stipulated an amount for depreciation, and the sole issue before the Court is whether petitioners are entitled to an interest deduction in 1968 for prepaid interest. FINDINGS OF FACT Some of the facts have been stipulated and the stipulation of facts, together with the exhibits attached thereto, are found accordingly. Irwin Holtzman (hereinafter referred to as petitioner) and Nohemi Holtzman are husband and wife. At the time they filed their petition herein, they resided in Corona, Calif. They timely filed their 1968 Federal income tax return with the Western Service Center, Ogden, Utah. They reported their income on the cash method of accounting. In 1967 petitioner entered into the foreign commodity market arranging with the Cambio Valorenbank of Zurich, Switzerland (hereinafter the bank) to purchase silver. An oral agreement was made with the bank to borrow money for the purchase of silver bullion. The bullion was stored *154 in London, with the bank retaining custody. Three accounts were opened by the bank identified as (a) Safe Custody Account (Pledged) ("silver account"); (b) Commodity Silver Account (Loan Account) ("loan account"); and (c) Prepaid Interest Account. The bank loaned the full amount of the bullion's purchase price after it received money from the petitioner which was placed in the prepaid interest account. The amount placed in the prepaid interest account determined the amount of silver the bank would purchase. When a purchase of silver was made by the bank, petitioner pledged the silver as security for the loan. At that time, the loan account was credited and a like amount was debited (in the form of silver bullion) to the silver account. If the price of the pledged silver decreased, the bank required that money be paid into the loan account to reduce the indebtedness in the loan account. The petitioner could request the bank to sell the silver at any time, with the proceeds debited to the loan account and the sold silver bullion credited to (taken out of) the silver account. If a sale resulted in a loss, petitioner was required to pay into the loan account. If a sale of all *155 the silver was made at the price paid or at a profit, any excess amount in the prepaid interest account was refundable to petitioner at his request. The petitioner could not verify that promissory notes were signed. There was no designated time for the termination of the loan. The interest rate fluctuated according to the Bank of England interest rate. During 1968, petitioner's quarterly interest charges and loan account balances were as follows: Loan Debit Date
Quarterly Interest
Balance
January 1, 1968
$25,626
March 31, 1968
$328.60
25,627
June 30, 1968
326.40
6,348
September 30, 1968
237.10
45,639
December 31, 1968
679.40
48,174
(1968 - total interest = $1,571.50) In 1968, petitioner paid the bank $9,000 which was credited to the prepaid interest account. When the $9,000 was added to the prepaid interest account, previous funds were still contained in the account.Also sometime during the second half of 1968 petitioner borrowed $41,826 from the bank. Of this amount, $2,500 was applied to the prepaid interest account and became a part of the $9,000 added in 1968, and $39,326 was used for the acquisition of silver bullion. The *156 cost for the use of borrowed money from the bank was $1,571.50 during 1968. The similar silver transaction was made in 1967. The interest deduction was questioned by the Commissioner, audited and entirely allowed. OPINION In 1967, petitioner entered the foreign commodity market by arranging with a Swiss bank to purchase silver. Before the silver was purchased, petitioner was required to place money into a "prepaid interest" account. The bank would then loan him the full purchase price for the silver. Petitioner pledged the silver as security for the loan and it remained in custody of the bank until sold. The interest rate was variable and the bank accounted for and charged the interest quarterly. During 1968, petitioner placed $9,000 into the prepaid interest account. The parties agree he incurred quarterly interest charges in the sum of $1,571.50 for that year. The issue herein is whether the remaining $7,428.50 is interest and should be allowed as a deduction for 1968. 1. Validity of Prepaid Interest Deduction
Petitioner contends that the entire $9,000 represents prepaid interest on the money loaned him for the acquisition of the silver, which amount is fully *157 deductible in 1968. Respondent contends that the $9,000 was not compensation paid for the use or forebearance of money. Rather, the payment was used by the bank either as security, a deposit to be applied as interest when charged in the future, or for some other purpose. Thus, respondent contends only the actual amount of incurred interest charges ($1,571.50) is deductible. Section 163(a)[1] provides that "There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." It is essential that actual payment be made by a cash basis taxpayer if he is to be entitled to the deduction afforded by section 163(a). Clinton H. Mitchell,42 T.C. 953 (1964). Petitioner bears the burden of proving that the amounts in issue constituted interest on indebtedness within this section. Rule 142(a), Tax Court Rules of Practice and Procedure; Kenneth D. LaCroix,61 T.C. 471 (1974). We conclude petitioner has not met this burden.
*158 Payments labeled as interest are not necessarily deductible as interest. The mere crediting of interest on a ledger account does not in and of itself constitute interest. Lewis C. Christensen,40 T.C. 563 (1963). Interest is the "compensation for the use or forebearance of money." Deputy v. duPont,308 U.S. 488, 498 (1940). It is a principle of long standing that the application of this definition is governed by the economic realities rather than the form, or labels, in which the transaction is cast. Knetsch v. United States,364 U.S. 361 (1960); Salley v. Commissioner,319 F. 2d 847 (5th Cir. 1963), affg. a Memorandum Opinion of this Court; United States v. Roderick,290 F. 2d 823 (5th Cir. 1961); United States v. Salley,290 F. 2d 708 (5th Cir. 1961); Weller v. Commissioner,270 F. 2d 294 (3d Cir. 1959), affg. W. Stuart Emmons,31 T.C. 26 (1958), and Carl E. Weller,31 T.C. 33 (1958). Petitioner's arrangement with the bank *159 whereby the bank loaned him 100 percent of the funds with which it bought silver bullion enabled him to acquire almost $40,000 worth of silver bullion in 1968 without any down payment. The amount of money he placed in the prepaid interest account determined the amount of the loan made by the bank. Petitioner could not provide testimony on what determined or who determined how much money was to be placed into that account. It appears that he put in whatever funds he had available. If a loss occurred when the silver was sold, petitioner had to reduce the remaining loan indebtedness. If the value of the silver decreased substantially while in custody of the bank, petitioner was required to pay off part of the loan upon demand by the bank. The interest charges for this loan were determined and accounted for on a quarterly basis by the bank.While it is true that the bank had custody of the prepaid interest account and absolute control over petitioner's silver account, there is no evidence that the bank was restricted from applying the funds remaining in the prepaid interest account to the indebtedness. Petitioner asserts that the $9,000 he deposited to obtain borrowed money from *160 the bank is an ascertainable sum paid for use of borrowed money. The facts are clear that petitioner had the right to sell silver at any time. Barring any loss, he also had the right to receive the unearned portion of the amount left in his prepaid interest account. Moreover, the prepaid interest account covered no specific period of time and since the interest rate also fluctuated, there is no way to ascertain which of the loans the prepaid interest account represented. Due to these possibilities and uncertainties, petitioner could not say with certainty that the $9,000 would ever be paid or incurred as interest. The Court has consistently disallowed interest in cases involving economic transactions which are similar to petitioner's. In LaCroix,supra, $250,000 prepaid interest was paid at closing for a $1,300,000 office building. There was no deposit; rather, the land and the building were security for the purchase in the form of a "wrap-around" mortgage. The Court concluded that: * * * After considering the economic realities in the instant case, we conclude that the $250,000 was in substance a deposit or down payment on the $1,300,000 principal *161 due. As did the Court in Titcher, we find it difficult to believe that there was no down payment on so large a purchase price. * * * [61 T.C. at 480.] It is noted that in this case the $9,000 deposited by petitioner in the prepaid interest account, along with the balance then in that account, enabled him to purchase silver at a price of $39,326. Petitioner attempts to distinguish his case from LaCroix by asserting that the prepaid interest in LaCroix was to be applied to principal at a later date. We believe that this could also be true in petitioner's case. In Norman Titcher,57 T.C. 315 (1971), a similar determination was made on money labeled prepaid interest. This Court there held that the money was a down payment because there was no existing obligation at that time on which interest could accrue. In petitioner's case, there was no existing obligation on the remaining $7,428.50, but rather, only the mere possibility that one would arise. In Andrew A. Sandor,62 T.C. 469 (1974), affd. 536 F.2d 874 (9th Cir. May 28, 1976), the taxpayer bought mutual funds by obtaining a $100,000 loan from *162 a bank and using the mutual funds as collateral for the loan. He signed a promissory note which was payable on demand or, if no demand was made, due five years after the date of the note. The entire interest was payable in advance. If the taxpayer prepaid the principal of the note at any time prior to its due date, the bank was obligated to refund to him the unearned portion of the prepaid interest, except for the minimum of 90 days' interest. This Court held that while the record did not indicate whether the principal was prepaid, the unearned portion of the interest was refundable to Sandor any time the balance of the principal was paid. We stated: * * * It would be quite plausible to consider the prepaid interest as a deposit to be applied as interest when earned in the future, rather than a payment of interest in 1968. * * * [62 T.C. at 482.] In this case petitioner could withdraw the unearned portion of the prepaid interest account if he made a profit or broke even when the silver was sold. Even though some of these cases cited above basically deal with the question of genuine indebtedness, the conclusions reached with regard to deposits designated *163 as prepaid interest are applicable here. Nor is there any merit in petitioner's reliance on Rev. Rul. 70-221[2] to rebut respondent's contention that part of the money ($7,428.50) given to the bank was a deposit. The purpose of Rev. Rul. 70-221 was to define the relationship between an investor and a broker in a margin account as one of a debtor and creditor even though the collateral (securities) in the margin account usually exceeds the amount owed to the broker. This relationship establishes the necessary indebtedness to allow the taxpayer an interest deduction for the broker's prior charges. The ruling states: * * * the credits to the taxpayer's account will be first applied as payment of interest previously charged by the broker. * * * Petitioner applies this same reasoning to his account: he deposits money in a prepaid interest account so the bank will buy him silver, just as a broker purchases stock for his customers after they deposit money in a margin account. Ergo, the deposits in the prepaid *164 interest account are subject to previous charges in the same vein as a margin account and, therefore, can be applied as interest. Petitioner overlooks the important distinction between the principles of the revenue ruling and his case. While petitioner maintains that the interest was prepaid by virtue of the money in a designated prepaid interest account, there is no assurance that the prepaid interest account would not be used to pay off the remaining indebtedness if the loan account proved insufficient. Rev. Rul. 70-221 allocates the deposit first to prior interest charges. In this case respondent allowed petitioner $1,571.50 for "interest previously charged" by the bank. Nothing guarantees that an allocation to interest will ever occur for the remainder in the prepaid interest account. Therefore, the remainder in the prepaid interest account is not payment of interest previously charged as defined by Rev. Rul. 70-221. Since we have only allowed a deduction for the $1,571.50 of interest actually debited by the bank, we do not reach respondent's alternate argument that in any event the $2,500 of the 1968 loan deposited in the prepaid interest account *165 is not deductible. 2. Equitable Estoppel
Petitioner claims respondent is estopped to deny the 1968 disallowance since a similar prepaid interest transaction took place in 1967 and respondent allowed a deduction after an audit of petitioner's 1967 tax return. He contends that the denial of a deduction for the 1968 interest would result in a detriment to him since he relied on the treatment accorded his 1967 return in his 1968 transactions. By claiming estoppel the petitioner draws upon himself the burden of affirmatively establishing the facts in support of detrimental reliance. Crossett Lumber Co. v. United States,87 F. 2d 930 (8th Cir. 1937). In the first place, the testimony does not support petitioner's claim that he relied on the results of the previous audit. He could not recall when the 1967 audit began or was concluded and, therefore, that he knew the results of the 1967 audit when he engaged in the 1968 transactions. Nor could he substantiate he suffered any alleged detriment as a direct result of respondent's prior action. In order for petitioner *166 to meet his burden he must show more than the mere possibility of incurring smaller losses in another investment. Furthermore, as the Supreme Court stated in Dixon v. United States,381 U.S. 68, 72-73 (1965): [3]
In Automobile Club of Michigan v. Commissioner, * * * [353 U.S. 180] at 183-184, we held that the Commissioner is empowered retroactively to correct mistakes of law in the application of the tax laws to particular transactions. He may do so even where a taxpayer may have relied to his detriment on the Commissioner's mistake. See Manhattan General Equipment Co. v. Commissioner,297 U.S. 129. This principle is no more than a reflection of the fact that Congress, not the Commissioner, prescribes the tax laws. The Commissioner's rulings have only such force as Congress chooses to give them, and Congress has not given them the force of law. * * * [Fn. ref. omitted.] 3. Constitutional Rights
Petitioner also contends he was misled during conferences *167 with respondent in that the information he provided as to the manner the bank handled his last transaction with it in 1969 which resulted in a loss would not be used against him in trial. Thus, he claims his Fifth Amendment rights were abridged since he was given no Miranda[4] warnings. There is no substance to this contention. 4. Statute of Limitations
Petitioner asserts in brief that respondent supports his position with cases occurring after his disallowance which were decided after the statute of limitations had run. Again there is no substance to this contention. 5. Conclusion
Petitioner has not met his burden of proving that the $7,428.50 added to the prepaid interest account in 1968 was interest on indebtedness for that year. Due to concessions of the parties, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the provisions of the Internal Revenue Code of 1954 in effect during the taxable year in issue.↩
2. Rev. Rul. 70-221, 1970-1 C.B. 33↩.
3. Cf. James V. Cole,64 T.C. 1091↩ (1975).
4. Miranda v. Arizona,384 U.S. 436↩ (1966).